*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0126p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MATTHEW GRAY,

      *Petitioner-Appellant,*

    *v.*

ERNIE L. MOORE, Warden,

      *Respondent-Appellee.*

No. 06-3547

>

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 03-00520—Susan J. Dlott, District Judge.

Argued: February 8, 2008

Decided and Filed: March 26, 2008

Before: KENNEDY, MARTIN, and COLE, Circuit Judges.

---

### COUNSEL

**ARGUED:** Craig M. Jaquith, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Thelma Thomas Price, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Craig M. Jaquith, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Thelma Thomas Price, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

---

### OPINION

---

    R. GUY COLE, JR., Circuit Judge. On June 27, 2001, a jury in Hamilton County, Ohio, convicted Matthew Gray of aggravated murder and kidnapping, both with firearm specifications. After exhausting his remedies in state court, Gray filed the instant petition for a writ of habeas corpus in the United States District Court for the Southern District of Ohio, arguing that the trial court violated his constitutional rights to due process, to be present at his trial, and to confront the witnesses against him, when it removed him from the courtroom without warning him of the consequences of his actions. Because we conclude that the Ohio appellate court unreasonably applied *Illinois v. Allen*, 397 U.S. 337 (1970), and because the error had a substantial and injurious effect on the outcome of Gray's kidnapping conviction, we **REVERSE** the district court's judgment and **GRANT** a conditional writ of habeas corpus with respect to that conviction. However, because the record supports Gray's aggravated murder conviction irrespective of the constitutional error, we

**AFFIRM** the district court's denial of Gray's habeas petition with respect to the aggravated murder conviction.

## I.

The case before us has its roots in a long-standing family feud between Matthew Gray, a resident of Columbus, Ohio, and his brother Daniel over the custody of their incapacitated father. After the family admitted their father into a nursing home, a probate court determined that Daniel and their sister, Loretta, should make all personal, health care, and financial decisions for their father, including the sale of their father's real property, and excluded Gray from any guardianship role. The lingering animosity between Gray and Daniel over these events finally came to head shortly before October 5, 2000, when a construction crane owned by Gray, stored on a parcel of land adjacent to his father's property, disappeared. Gray immediately suspected Daniel of selling it for personal profit.

The crane, whether stolen or merely missing, a fact never resolved at trial, is what turned this family dispute deadly. On October 5, 2000, at approximately 10 p.m., Gray drove from Dublin, Ohio to Daniel's residence in Forest Park, Ohio with a loaded .38 caliber pistol in his pocket to question Daniel about the missing crane. According to the testimony of Adrian Evans, Daniel's girlfriend and the only eyewitness to the events, the conversation between Gray and Daniel appeared to be "[n]ormal at first," but "[t]hen they got loud," ending in Gray yelling, "Where is [the crane] at?" (Joint Appendix ("JA") 452.) Daniel attempted to sidestep the conversation, but Gray raised his voice again and demanded that they discuss the whereabouts of the crane immediately. When Daniel finally told Gray to "[g]et out of my house," Gray responded, "I told you, motherfucker, what I was going to do," pulled his pistol out, and shot his brother twice as he attempted to flee down a hallway. (JA 455.)

After hearing Gray fire the shots, Evans unsuccessfully attempted to hide under a bed located in a room at the end of the hallway. When Gray found Evans in the room, he told her, "This is between me and Dan," put the barrel of the gun to her forehead, and forced her to the front of the house. (JA 460.) Evans testified that twice Gray left her to discharge additional shots into his brother's body. When Gray left for the second time, Evans crawled to a second exit in the residence and fled to summon police from a neighbor's house.

Officer Tom Wells of the Cincinnati Police Department testified that after leaving the scene of the crime, Gray drove to Cincinnati, walked into the police station visibly distraught, and pleaded repeatedly, "You've got to help me." (JA 591.) When police asked Gray what had happened, Gray explained that "[he] didn't mean to shoot him." (JA 593.) Immediately, police handcuffed Gray and took him into custody. Shortly thereafter, Gray directed them toward the missing pistol, which he had thrown out the window on his drive toward the Cincinnati police station.

Gray's version of the shooting differed at trial in a few relevant respects. In an interview with Officer Patrick Carr of the Forest Park Police Department, which occurred shortly after police had taken him into custody, Gray explained that he had accidentally shot his brother. After the argument over the missing crane became heated, Daniel pushed him, causing him to fall backwards; as he fell,"his hand came out of his pants pocket and the gun went off." (JA 618.) Gray also admitted that Evans overheard the entire confrontation, but he claimed that after the shooting, he ushered her to the front inside steps, told her to be calm, and assured her that he would not hurt her.

A jury convicted Gray of all charges, and the trial court sentenced him to consecutive terms of life in prison with parole eligibility after twenty years for aggravated murder, ten years for kidnapping, and three years mandatory for the firearm specifications.

With the assistance of new counsel, Gray appealed to the Hamilton County Court of Appeals, First Appellate District, alleging that his trial counsel was ineffective for failing to request a jury instruction on the lesser offense of manslaughter. Appellate counsel also submitted five pro se assignments of error, which included a claim that, under *Illinois v. Allen*, 397 U.S. 337 (1970), the trial court violated Gray's constitutional rights to due process and to confront witnesses against him when the judge removed him from the courtroom without warning him of the consequences of his actions. To support this claim, Gray referenced the following exchange between the court, the State's trial counsel, and himself, which took place during the direct examination of Evans at trial:

> Q: What did he do when you spoke back to him?
> A: He put the gun right here –
> THE DEFENDANT: Why are you lying? You lying. You know it.
> THE COURT:   Deputy –
> THE DEFENDANT: She knows she's lying.
> THE COURT: Deputy, remove him from the courtroom.
> THE DEFENDANT: She's lying, your Honor.
> MR. GIBSON [prosecutor]: Judge, I'd like him out of the room.
> THE COURT: What?
> MR. GIBSON: I'd like him out of this room.
> THE DEFENDANT: She's lying.
> THE COURT: Remove him from the courtroom.
> THE DEFENDANT: Your Honor, she's lying. She knows it. She's lying.
> (The defendant left the courtroom).
> THE COURT: The jury will disregard anything the defendant said.

At the end of Evans's direct examination and outside of the jury's presence, the trial judge explained that he ordered the removal of Gray because Gray had made "two or three separate outbursts within a fairly short period of time," and that "the defendant's outburst . . . was extremely loud and [] persistent." (JA468.) Right before the court recessed for a lunch break, the trial judge asked Gray's attorney to explain to Gray, who was being held in confinement, that he would not be allowed back in court for the remainder of Evans's testimony, including cross-examination. When the court finally allowed Gray to return, the court inquired as to whether there would be any other outbursts, to which Gray responded in the negative and apologized for his earlier behavior. The court admonished Gray to speak "in hushed tones" to his attorney and explained that he had no intention of binding and gagging Gray, but would return him to jail if his misconduct continued. The judge ultimately found Gray in contempt for his outburst. At no time did Gray or his attorney object to Gray's removal.

The state court of appeals affirmed the judgment of the trial court, finding all of Gray's claims to be without merit. On the key question of whether the trial court erred when it removed Gray from the courtroom for his outbursts during a witness's testimony, the court of appeals determined that the trial judge's immediate removal of Gray from the courtroom was well within the court's "sound discretion to avoid disruptive conduct by the defendant." *State v. Gray*, Nos. C-010527, C-010533, slip op. at 3 (Ohio Ct. App. June 19, 2002) (unpublished).

After exhausting his post-conviction remedies in the state court system, Gray filed the instant petition for a writ of habeas corpus in the United States District Court for the Southern District of Ohio. Magistrate Judge Timothy S. Black issued a Report and Recommendation, suggesting that Gray's petition be denied. With respect to the main issue–whether Gray's conviction should be set aside because the trial court forced him to leave the courtroom–the Report found that the United States Supreme Court had not established the necessity of a warning before removing a defendant

from a courtroom, and pointed to disagreement among federal courts for support. The Report also concluded that Gray had not demonstrated that his absence during the victim's testimony negatively affected the jury's verdict, and thus any error was harmless.

On March 1, 2006, the district court summarily adopted the Magistrate's Report and Recommendation and dismissed Gray's habeas petition, but granted a certificate of appealability with respect to Gray's claim that he was denied his constitutional right to confront a witness when he was removed from the courtroom. Gray timely appealed.

## II.

### A.

We review the district court's legal conclusions in a habeas proceeding de novo. *Dennis v. Mitchell*, 354 F.3d 511, 516-17 (6th Cir. 2003). Because Gray filed his petition for habeas relief after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), his petition is governed by AEDPA's standards. *Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2006).

AEDPA states, in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. § 2254(d)(1).

The phrase "clearly established Federal Law, as determined by the Supreme Court" means "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A decision is "contrary to" clearly established federal law as determined by the Supreme Court if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Id.* at 413. A decision is an "unreasonable application" of clearly established Supreme Court law if a "state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* "The Court has made clear that its relevant precedents include not only bright-line rules but also the legal principles and standards flowing from precedent." *Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002).

### B.

Gray raises one issue on appeal: The Ohio appellate court unreasonably applied the constitutional rule announced in *Illinois v. Allen*, 397 U.S. 337 (1970), when addressing the facts of his case. Because *Allen* stands for the proposition that a trial court must warn a defendant of the possible consequences of continued misbehavior prior to removing him from the courtroom, we conclude that Gray is correct.

A defendant's right to be physically present at every stage of his trial has a longstanding tradition in this country's criminal jurisprudence, with roots in both the Due Process Clause,

*Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) ("[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure."), and the Confrontation Clause of the Sixth Amendment, *Allen*, 397 U.S. at 338 ("One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial."). This right, however, is not absolute, particularly when a defendant "engages in speech and conduct which is so noisy, disorderly, and disruptive that it is exceedingly difficult or wholly impossible to carry on the trial." *Id.*

In *Allen*, the Court addressed whether an accused may claim the benefit of his constitutional right to remain in the courtroom while engaging in disorderly conduct. After demanding to represent himself rather than be represented by counsel during jury selection, Allen "started to argue with the judge in a most abusive and disrespectful manner." *Id.* at 339. The judge instructed Allen's standby appointed counsel to handle the remainder of the voir dire, but he continued to disrupt the proceedings, including by threatening the judge, "When I go out for lunchtime, you're [] going to be a corpse here," tearing his attorney's file, and throwing papers in the file on the floor. *Id.* at 340. When the trial judge warned Allen that he would be removed if his behavior continued, Allen in turn raised the stakes: "There's not going to be no trial either. I'm going to sit here and you're going to talk and you can bring your shackles out and straight jacket and put them on me and tape my mouth, but it will do no good because there's not going to be no trial." *Id.* As a result of that outburst, the judge removed Allen from the courtroom for the remainder of voir dire. *Id.*

The judge allowed Allen to return to the courtroom for the trial upon the condition that he would conduct himself appropriately and not interfere with the introduction of evidence. But cooperate, he did not. Only minutes after being readmitted, Allen again interrupted the proceedings and promised to continue to do so. *Id.* at 341. The trial judge then, for the second time, ordered the removal of Allen from the courtroom for the remainder of the presentation of the state's case-in-chief, except for several brief appearances for identification purposes. *Id.* At the close of the state's case, the trial court again allowed Allen to return on his assurance that he would conduct himself properly. Allen was permitted to stay in the courtroom for the remainder of the trial. *Id.*

Faced with those facts, the Court in *Allen* made clear the minimum constitutional requirements when dealing with a disorderly defendant:

> Although mindful that courts must indulge every reasonable presumption against the loss of constitutional rights, *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938), we explicitly hold today that a defendant can lose his right to be present at trial if, *after he has been warned by the judge that he will be removed if he continues his disruptive behavior*, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom. Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.

*Id.* at 343 (emphasis added). After observing that the trial court had repeatedly warned the defendant that he would be removed if he persisted in his unruly conduct, the Court found that the state court acted within its discretion and affirmed the conviction. *Id.* at 346-47.

With these principles in mind, and in light of the explicit language used by the Supreme Court, we conclude that the Ohio appellate court unreasonably applied *Allen* when it affirmed Gray's removal despite the absence of a prior warning by the trial court. While it is without question that Gray engaged in disorderly and disruptive behavior when he repeatedly yelled, "She's lying," in the middle of Evans's testimony, at most this conduct entitled the trial court to *threaten* removal. However, "no action against an unruly defendant is permissible except after he has been fully and fairly informed that his conduct is wrong and intolerable, and warned of the possible consequences of continued misbehavior." *Id.* at 350 (Brennan, J., concurring).

Moreover, our reading of *Allen* is bolstered by the subsequent codification of the rule in Federal Rule of Criminal Procedure 43(c), which specifies the situations when a defendant may waive his continued presence at trial: "A defendant who was initially present at trial . . . waives the right to be present . . . when the court *warns the defendant* that it will remove the defendant from the courtroom for disruptive behavior, but the defendant persists in conduct that justifies removal from the courtroom." (emphasis added). As the advisory committee notes make clear, Rule 43(c) mirrors the central teachings of *Allen*, *see* Fed. R. Crim. P. 43 advisory committee's note ("The revision of rule 43 is designed to reflect *Illinois v. Allen* . . . ."), including the idea that prior warning is an indispensable part of the constitutional rule.

The State makes two primary arguments on appeal: (1) that *Allen* should be read as giving trial courts discretion in determining when an accused's behavior warrants sanction and what sanction to impose; and (2) that *Allen* should be distinguished on the specific facts of that case. We find neither argument compelling.

In considering the first objection, the Supreme Court admittedly explained that trial courts "must be given sufficient discretion to meet the circumstances of each case," and that "[n]o one formula for maintaining the appropriate courtroom atmosphere will be best in all situations." *Allen*, 397 U.S. at 343. However, we read this passage from *Allen* as according trial courts the discretion to identify the best method for dealing with an unruly defendant, but not as altering the requirement of providing a warning before implementing a chosen method. Thus, even if we are to give due deference to a trial court's preferred remedy–whether to either bind or gag a defendant, cite a defendant for contempt, or take him out of the courtroom–such deference is only deserving after a trial court apprises the defendant of the consequences of misbehavior and offers him a chance to comply with the required courtroom decorum. *Id.* at 344-45 (discussing the variety of ways a trial court may abate an accused's outburst during trial).

Nor are we persuaded by the State's belief that the warning requirement is limited to the specific facts of *Allen*. Although several of our sister circuits have held that trial courts may eschew the warning requirement when a defendant engages in extremely unruly behavior, we believe that the warning requirement from *Allen* cannot be interpreted in any non-mandatory way, lest we substitute our own judgment of what the rule should be for that of the Court. In *Gilchrist v. O'Keefe*, 260 F.3d 87, 97 (2d Cir. 2001), for example, the Second Circuit, in comparing the rule of *Allen* to other forfeiture scenarios, commented: "We note that while *Allen* stated that a defendant could be removed from the courtroom 'after he has been warned by the judge,' it did not indicate whether such a warning was a requirement in every situation." *See also United States v. Goldberg*, 67 F.3d 1092, 1101 (3d Cir. 1995) ("Whether or not the warning was required as a matter of constitutional law or under the particular facts is somewhat unclear.").[1]

---

[1] In *United States v. Konicov*, 49 F. App'x 607, 608-09 (6th Cir. 2002) (order), the trial court removed a defendant during trial when the defendant remained seated when asked to rise for the judge, ignored repeated instructions not to testify during his opening statement, and engaged in a pointless debate over the court's jurisdiction. This case should not be read for the proposition that a defendant may be removed without notice because the district court in *Konicov* repeatedly asked the defendant to desist prior to his removal. *Id.* at 608. In any event, *Konicov* was unpublished

But as already explained, the proper reading of *Allen* requires a trial court to give the accused one last chance to comply with courtroom civility before committing the "deplorable" act–in the *Allen* Court's words–of removing that person from his own trial. *Allen*, 397 U.S. at 347. While decisions by other courts "may be informative . . . to determine whether a legal principle or right had been clearly established," *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003), we only look to the holdings of the Supreme Court in determining whether a state court unreasonably applied clearly established law. And here, because these courts' readings of *Allen* contravene the Court's clear language, we conclude that lower court cases cannot create ambiguity in a Supreme Court holding where none exists.

Furthermore, even if there are some situations in which a trial court may remove a defendant without warning for extremely unruly behavior, the Supreme Court has not yet defined those situations, and the facts of the instant case do not require us to carve out such an exception. Assume for argument's sake that *Allen* should be read as imposing a requirement that a trial court balance the degree of the defendant's misconduct against the loss of constitutional rights. The adequacy of the warnings, then, should be read as part of the context in which the trial judge acts, and against the backdrop that removing a criminal defendant from the courtroom should be limited to those cases where the defendant is "so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Allen*, 397 U.S. at 343.

Here, however, Gray did not exhibit a pattern of behavior "clearly of such an extreme and aggravated nature as to justify either his removal from the courtroom or his total physical restraint." *Id.* at 346. *See also Gilchrist*, 260 F.3d at 97 (holding that "a defendant may be found to have forfeited certain trial-related constitutional rights based on *certain* types of misconduct," and finding that physically assaulting one's attorney justified forfeiting the right to counsel) (emphasis added). In contrast to the multiple threatening and disrespectful outbursts by the accused in *Allen*, Gray made a only a few protestations regarding the truthfulness of the testimony of the State's key witness. Thus, deference and discretion aside, any attempt to distinguish *Allen* from the instant case would be an objectively unreasonable application of clearly established precedent. *See also United States v. Lawrence*, 248 F.3d 300, 305 (4th Cir. 2001) ("Warning is an integral part of the rule, as well as to the constitutional underpinnings of the rule itself."); *Foster v. Wainwright*, 686 F.2d 1382, 1388-89 (11th Cir. 1982) ("[W]e would not hold that a trial court's otherwise clear abuse of discretion–such as, for example, ordering, impetuously and without adequate warning, the removal of an only slightly disruptive defendant–is not a ground for relief if the defendant can show no prejudice."); *United States v. Taylor*, 478 F.3d 689, 692 n.6 (1st Cir. 1973) ("[T]he Court said that before an unruly defendant could be said to lose his right to be present at his own trial, he must be specifically so warned and told that the trial would continue in his absence . . . .").

We recognize that "the balancing of the defendant's confrontation right with the need for proper administration of justice is a task uniquely suited to the trial judge," *Scurr v. Moore*, 647 F.2d 854, 858 (8th Cir. 1981), and that a trial court has a significant interest in "dignity, order, and decorum" in its courtroom, *Allen*, 397 U.S. at 343. Nonetheless, the *Allen* Court crafted a careful formula for balancing courtroom security, the discretion accorded to trial courts, and the principle that "courts must indulge every reasonable presumption against the loss of constitutional rights," *id.*, when it made the explicit requirement that a defendant be warned prior to any exclusion from the courtroom. Accordingly, we conclude that the Ohio court of appeals unreasonably applied the explicit holding in *Allen*, codified in Federal Rule of Criminal Procedure 43(c), when it excluded Gray from the courtroom without giving him prior warning.

---

and therefore does not serve as binding precedent. 6 Cir. R. 206(c).

**C.**

In a § 2254 proceeding, a court must assess whether the constitutional error in the state-court criminal trial "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993); *Fry v. Pliler*, 127 S. Ct. 2321, 2328 (2007). If we are in "grave doubt" as to whether the error had such an effect, "that error is not harmless." *O'Neal v. McAnich*, 513 U.S. 432, 436 (1995). The *O'Neal* Court explained that "[b]y 'grave doubt' we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.* at 435. This inquiry does not assign an affirmative burden of proof on Gray, *id.* at 436, nor does it require Gray to show that the error was outcome-determinative, but instead "plac[es] the risk of doubt on the State." *Id.* at 439. *See also Ferensic v. Birkett*, 501 F.3d 469, 481 (6th Cir. 2007) (citing *O'Neal* for the proposition that "petitioners do not bear an affirmative burden of proof," and holding that "[u]ncertainty in answering this question . . . militates in favor of the habeas petitioner"); *Caldwell v. Bell*, 288 F.3d 838, 842 (6th Cir. 2002); *United States. v. Baugham*, 449 F.3d 167, 177 (D.C. Cir. 2006).[2] Whether the Government has met its burden with respect to both Gray's aggravated kidnapping conviction and his aggravated murder conviction is a question we turn to next.

**1.**

Ohio Rev. Code § 2905.01 defines aggravated kidnapping as follows:

> (A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> . . .
>
> (2) To facilitate the commission of any felony or flight thereafter;
>
> . . . .

During direct examination at trial, Evans testified first to details of the initial shooting, and then turned to the facts which gave rise to the aggravated kidnapping conviction. It was at the exact moment in which Evans testified, "He put the gun right here," referring to when Gray allegedly forced her to the front of the house at gunpoint, that Gray interrupted the proceedings by yelling: "Why are you lying? You lying. You know it." (JA 458.) After the trial court immediately removed Gray from the proceedings, the jury heard the rest of Evans's testimony that he placed a gun barrel against her head and forced her to the front of the house, and convicted him based solely on this testimony.

In light of the total absence of corroborating evidence to support aggravated kidnapping, we are in "grave doubt" as to whether the trial court's error had a prejudicial effect on his conviction. Although the Sixth Amendment's requirement of face-to-face, person-to-person confrontation of the accused by his accusers "comes to us on faded parchment, with a lineage that

---

[2] There is some uncertainty in this Circuit as to where the burden of persuasion for showing harmless error falls. *See, e.g.*, *Stewart v. Erwin*, 503 F.3d 488, 503 (6th Cir. 2007) (stating in dicta that the burden falls on the defendant); *Ruimveld v. Birkett*, 404 F.3d 1006, 1014 (6th Cir. 2005) (same). We note, however, that when this Court previously placed the burden of persuasion on the habeas petitioner, *O'Neal v. Morris*, 3 F.3d 143, 145 (6th Cir. 1993), the Supreme Court vacated that decision and held that this Circuit misapprehended the harmless error inquiry when it placed the burden of establishing prejudice on the habeas petitioner, *O'Neal v. McAnich*, 513 U.S. at 435-39. *See also United States v. Dominguez Benitez*, 542 U.S. 74, 81 n.7 (2004) ("When the Government has the burden of showing that constitutional trial error is harmless because it comes up on collateral view, the heightened interest in finality generally calls for the Government to meet the more lenient *Kotteakos* standard.") (citing *Brecht*, 507 U.S. at 638).

traces back to the beginnings of Western legal culture," *Coy v. Iowa*, 487 U.S. 1012, 1015 (1988) (citation omitted),[3] the value of requiring adverse witnesses at trial to testify in the accused's presence is not merely symbolic. An accused's physical presence during a witness' testimony enhances the accuracy of fact-finding by reducing the risk that the witness will wrongfully implicate an innocent person. Indeed, "[i]t is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' . . . That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult." *Id.* at 1019-20. *See also United States v. Hamilton*, 107 F.3d 499, 503 (7th Cir. 1997) ("[F]ace-to- face confrontation ensures the reliability of the evidence by allowing the trier of fact to observe the demeanor, nervousness, expressions, and other body language of the witness."). At oral argument, the State's counsel noted that Gray's outburst made Evans visibly uncomfortable and that the trial court appropriately removed Gray for this reason. However, this justification undermines the fundamental purpose of face-to-face confrontation: placing the witness under the scrutinizing–and occasionally hostile–gaze of the accused. While we can understand that the presence of an accused may make a witness feel nervous or even threatened, particularly if the witness is a victim to the crime, the principles embodied in the Sixth Amendment are not meant to protect the rights of witnesses, but rather those of the accused, whose life and liberty lies in the hands of his peers.

In addition to the value of forcing a witness to testify face-to-face with the accused, another "primary interest secured by [the Confrontation Clause] is the right of cross-examination," *Douglas v. Alabama*, 380 U.S. 415, 418 (1965), which "is critical for ensuring the integrity of the fact-finding process," *Kentucky v. Stincer*, 482 U.S. 730, 736 (1987). By "integrity," we do not merely mean the perception of a fair trial, but also the tactical assistance Gray could have offered his attorney while he questioned Evans about her testimony. *See Badger v. Cardwell*, 587 F.2d 968, 977 (9th Cir. 1978). Although Gray had the opportunity to consult with his attorney after the court removed him from the courtroom and before the start of Evans's cross-examination, Gray was not present during the actual cross-examination and therefore could not assist his attorney in following-up to any answers Evans provided on cross-examination. *Allen*, 397 U.S. at 344 (noting that "one of the defendant's primary advantages to being present at the trial [is] his ability to communicate with his counsel"). Moreover, Gray had been removed before Evans's account of the kidnapping on direct examination, and there is no evidence in the record indicating that he had been provided with a transcript of that part of the testimony. Thus, we cannot say that Gray had "a full and fair opportunity to probe and expose [Evans's] infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to [her] testimony." *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985).

In any event, we need not answer definitively *how* Gray's presence would have affected the substance of Evans's testimony or her demeanor in front of the jury. When considering whether a violation of an accused's confrontation rights affected the jury's verdict, the proper inquiry is not whether his absence negatively affected that particular witness' testimony, but instead whether the record as a whole supports the verdict irrespective of that testimony. "An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis

---

[3] This principle even stretches back to biblical times, when the Roman Governor Porcius Festus, discussing the proper treatment of his prisoner St. Paul the Apostle, stated: "It is not the manner of the Romans to deliver any man to die, before that he which is accused have the accusers face to face, and have licence to answer for himself concerning the crime laid against him." *Acts* 25:16 (King James).

of the remaining evidence." *Coy*, 487 U.S. at 1021-22.[4] *See also Brumley v. Wingard*, 269 F.3d 629, 646 (6th Cir. 2001) ("In terms of this court's harmless-error jurisprudence, the proper standard by which to gauge the injurious impact of the admission of constitutionally infirm evidence is to consider the evidence before the jury absent the constitutionally infirm evidence."). Because we do not determine whether Evans's testimony would have been unchanged had Gray remained in the courtroom, but instead inquire as to whether the conviction can be sustained based on the remaining evidence in the absence of her testimony, we conclude that the trial court's constitutional error "had substantial and injurious effect or influence in determining the jury's verdict" with respect to the kidnapping charge. *Brecht*, 507 U.S. at 637-38.

**2.**

Under Ohio Rev. Code § 2903.01(A), aggravated murder is defined as "purposely, and with prior calculation and design," causing the death of another person. "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." *Id.* § 2901.22(A). Moreover, "[n]either the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but momentary deliberation is insufficient." *State v. Taylor*, 676 N.E.2d 82, 91 (Ohio. 1997) (citation omitted). The Ohio Supreme Court has recognized that some short-lived emotional situations can serve as the basis for finding the mens rea element of aggravated murder. *Id.*

In contrast to Gray's kidnapping conviction, even without Evans's testimony, the other evidence presented at trial was more than sufficient to disprove Gray's defense that the shooting was accidental and to show that he had the requisite intent for aggravated murder. First, forensic evidence showed that Daniel was shot a total of five times, four of which were in his back. Robert Pfalzgraf, Chief Deputy Coroner and Director of Forensic Pathology at the Hamilton County Coroner's Office, testified the one bullet went in the back of the right arm; two others went in his back, one up by the armpit, right next to the shoulder blade and the other in the lower part of the back; one bullet went into the left thigh; and one went through Daniel's left wrist. Of all the gunshot wounds, only one, the wound in his wrist, could have entered through the front of Daniel's body. Pfalzgraf also testified that only one of the wounds–the one on his right arm–was from a close-range shot, and concluded that Daniel was shot at least four times in the back from a distance of more than two to three feet. Furthermore, the prosecution submitted photographic evidence of the crime scene, which showed the position of the body and multiple bullet holes in the hallway where Daniel was shot, and evidence that a styrofoam cup, half full, had been dropped in the middle of the hallway. All of the foregoing evidence supports the State's contention that, rather than being a single accidental shot, Gray shot Daniel multiple times as he attempted to flee down the hallway.

The State also presented ample evidence of lingering animosity between Gray and his brother over the custody of their incapacitated father, which finally boiled over when Gray

---

[4] The Supreme Court limited its holding in *Coy* two years later in *Maryland v. Craig*, 497 U.S. 836 (1990), when it determined that the Confrontation Clause did not categorically prohibit a child witness in a child abuse case from testifying outside of the defendant's physical presence by one-way closed circuit television. No doubt, we realize, that the necessity of face-to-face confrontation at trial must be "interpreted in the context of the necessities of trial and the adversary process," *id.* at 850, and indeed may "occasionally give way to considerations of public policy," *id.* at 849 (citation omitted). But those exceptions–e.g., certain types of hearsay or the testimony of child abuse victims–are only valid "where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850. Regardless, the Court in *Craig* did not question the importance of physical presence to the reliability of a witness's testimony in the absence of extraordinary circumstances, none of which are present in the instant case.

suspected Daniel of stealing a construction crane and selling it for personal gain. There is no dispute that on October 5, 2000, Gray drove over an hour to Daniel's house with a loaded .38 caliber handgun in his pocket to question him about the allegedly stolen crane. *See Taylor*, 676 N.E.2d at 91 (finding that where the defendant brought a gun to the scene and had a strained relationship with the victim, two or three minutes from the time of an initial argument to the time of the killing is sufficient to establish prior calculation). Gray also admitted to the shooting, did not call any witnesses on his behalf, and did not present any other evidence squarely contradicting the State's theory of aggravated murder. Thus, even when we exclude Evans's testimony, the evidence in the record is more than adequate to resolve any doubt we may have about the fairness of Gray's aggravated murder conviction.

## III.

For the aforementioned reasons, we **REVERSE** the district court's judgment and **GRANT** a conditional writ of habeas corpus with respect to Gray's aggravated kidnapping conviction, giving the State of Ohio ninety days in which to retry Gray on that charge. However, we **AFFIRM** the district court's denial of Gray's habeas petition with respect to the aggravated murder conviction.