NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0863n.06

No. 13-5753

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
*Nov 17, 2014*
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| v. | ) COURT FOR THE WESTERN |
| | ) DISTRICT OF TENNESSEE |
| CHRISTOPHER JOHN CLARK, | ) |
| | ) |
| Defendant-Appellant. | ) |

**BEFORE: GUY, CLAY, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** A federal jury found Christopher J. Clark guilty of one count of transporting a stolen vehicle in interstate commerce, 18 U.S.C. § 2312; three counts of carjacking, 18 U.S.C. § 2119; three counts of using a firearm during and in relation to a violent crime, 18 U.S.C. § 924(c); one count of felon in possession of a firearm, 18 U.S.C. § 922(g)(1); one count of possessing a firearm as a fugitive, 18 U.S.C. § 922(g)(2); and three counts of assaulting a federal officer, 18 U.S.C. § 111. The district court imposed an aggregate sentence of 919 months. Clark appeals his convictions and sentence. We **AFFIRM** Clark's conviction and sentence and **REMAND** for the administrative task of correcting the judgment.

**I.**

In early September 2006, Clark was an inmate at a jail in Franklin County, Alabama. The jail had a work-release program that allowed inmates to work offsite and return in the evening. Through the program, a contractor hired Clark and another inmate, Ronald Vernon, to clean, paint, and lay sheetrock at a lake house. Clark and Vernon completed the project during

the Labor Day weekend, but they did not return to the jail Sunday evening, September 3. The next day, jail officials discovered their absence and informed the contractor and law enforcement. Escape warrants later issued for their arrest.

After learning of Clark and Vernon's disappearance, the contractor went to the shop and discovered Vernon's truck stored inside. He noticed bloodstains on the truck and on clothing inside the truck. Later, the contractor realized a BMW 5-series, which a friend had stored on the property, was missing. When the contractor went to the lake house to see if Clark and Vernon were there, he saw that bungee cords used to secure trashcans were missing. The contractor's friend reported the stolen BMW to police.

An investigation revealed that Clark strangled Vernon with the bungee cords, transported Vernon's body in Vernon's truck, disposed of the body, abandoned the truck at the shop, and stole the BMW. After killing Vernon, Clark drove the BMW to Memphis, Tennessee, and met with his ex-girlfriend Michelle Phillips on Monday morning, September 4. As she watched him change clothes, she noticed blood on the clothes and scratches on his back and arms. Two men, Timothy Flemmons and Clarence Teal, also saw Clark driving the BMW in Memphis.

Sometime on Wednesday, September 6, Clark pawned the BMW to Flemmons for drugs. That evening, as Laila Leggette waited at a red light, Clark jumped into her Cadillac Deville and ordered her to take him to a specific hospital. He later confessed to her, "I'm going to be honest with you, this is a robbery." Clark opened Leggette's wallet, removed her identification card, and said, "[I]f you're going to call the police, I know where you live." He then directed her to turn down a dark alley, but she refused, fearing for her safety. After he again instructed her to turn, she pulled over, jumped out of the Cadillac, and ran away into oncoming traffic. Clark moved into the driver's seat and drove off.

In the early morning of Thursday, September 7, Memphis police stopped Flemmons and Teal in the BMW for speeding, and discovered that the vehicle was reported stolen in Alabama. Memphis police also learned Clark was a fugitive from Alabama and suspected him of carjacking Leggette. While conducting an investigation at an address associated with Clark, an officer spotted a man matching Clark's description driving a Cadillac. Police followed the Cadillac to a gas station, where they found it parked at a gas pump. As officers approached the vehicle, Clark came running out of the store, jumped into the driver's seat, and sped off.

Clark soon crashed the Cadillac into a telephone pole. He ran to a nearby Hyundai Tiburon and ordered the driver, Devonia Banks, out of the car at gunpoint. Banks obliged, and Clark took off in the Hyundai. A bystander approached the abandoned Cadillac and asked the woman sitting in the passenger seat (later identified as Clark's mother) if she needed assistance. She responded, "I'm fine. That's my son. He just told me he killed somebody."

Clark drove the Hyundai to the house where his ex-girlfriend Phillips was staying. After speaking with her, Clark went into the nearby house of his friends Earl and Ruth Ann Millican. Inside the Millican's home, Clark aimed a gun at Ruth Ann Millican and pulled the trigger, but it did not "go off." He then entered the room in which Earl Millican was sleeping, pointed the gun at his head and demanded money. Clark took over $3000 from the Millicans. Ruth Ann Millican reported to police that Clark told her, "I don't have nothing to lose anyway because I done killed two people." He then returned to Phillips' residence and told her he would not turn himself into authorities and "wasn't going back to jail."

After Clark left Phillips, police picked up the pursuit. Several times Clark directed the Hyundai at law enforcement vehicles, including at a U.S. Marshals Service special deputy, causing police to take evasive actions to avoid collision. During the chase, Clark called Phillips.

With sirens blaring in the background, Clark told her that "he would not pull over" and "was going out in a blaze of glory."

Police pursued Clark to a gas station, where Clark abandoned the Hyundai after a tire popped. At the gas station, he ran towards Mattie McKinney, who had just exited her Ford Taurus, and pointed a gun at her. She backed away from him, and Clark hopped into her car. As he tried to escape in the Ford—and with McKinney's mother in the passenger seat—Clark ran the car into a vehicle operated by another U.S. Marshals Service special deputy and pointed a gun at the special deputy. After police stopped the Ford, Clark attempted to flee on foot, but officers apprehended him. Police investigators recovered the firearm, a .45 caliber, semi-automatic pistol with a live bullet jammed inside, on the street near the gas station. A local news helicopter recorded Clark leading the chase in the Hyundai and continued recording through his eventual arrest.

On September 12, 2006, a federal grand jury returned a twelve-count indictment against Clark. Clark filed a motion in limine, seeking to bar the Government from introducing any evidence regarding Vernon's murder. The court found that the evidence was "intertwined and relevant," but concluded that it had "obvious potential prejudice." The court allowed the evidence "for the limited purpose of demonstrating that Defendant was a fugitive from justice under suspicion of murder," but forbade the Government from offering "any pictures or videos of the deceased or any testimony directly relating to the murder."

Sometime before trial, Clark's mother died. The Government filed a motion in limine seeking permission to introduce Clark's mother's statement, "He just told me he killed somebody," through the bystander to whom she made the statement. On the first morning of trial, the court stated that it would admit some evidence of Vernon's murder, but advised the

Government it wanted to hear background from each witness before the Government elicited any statements about the murder, and ordered the Government not to mention the mother's statement in opening statement or the fact that Vernon was murdered. The court later allowed testimony about the bloodstains on the truck, and, over objection, permitted the jury to hear Clark's mother's statement as evidence of Clark's state of mind.

During jury selection, Clark expressed his dissatisfaction with his counsel and requested to proceed pro se. The court questioned Clark on his request, including asking whether he was making the decision to waive his right to counsel voluntarily, and advised Clark several times that it would be wise to keep his appointed counsel. After the colloquy, the court granted Clark's request to waive counsel and proceed pro se, designating his lawyer as standby counsel.

At the start of the second day of trial, Clark witnessed a sidebar conversation between Government counsel and the court. Expressing his disagreement, Clark stated he was "removing [him]self from this case." He declined representation and refused to represent himself. He then suggested that he would "crawl under the table and lay under the table for a little while." The court cautioned Clark "to act right," then took a recess.

After the recess, the court asked Clark whether he was going to participate in the trial proceedings, but Clark refused to answer. The court then asked Clark if he was still going to crawl under counsel's table. When Clark refused to answer, the court responded: "Okay. Well, as long as you are quiet and not disruptive, you may remain in the courtroom . . . ." Clark then stood, prompting the court to ask, "By standing, are you telling me that you will not be quiet and you will be disruptive? You may be seated. Are you going to be compliant with the Court's orders?" Clark again voiced his refusal to participate in the proceedings. The court revoked his pro se status and asked standby counsel to resume representation. Frustrated, Clark asked to

leave.  The court warned him: "[I]f you'll just behave, we will leave you here.  Otherwise, I'm going to be forced to remove you . . . ."  The court instructed Clark to sit, but Clark again refused.  The court found that it could not "proceed with the trial in the manner in which he's behaving," and ordered the Marshals to remove Clark from the courtroom.

Sometime after Clark's removal, Marshals informed the court that Clark was not watching the proceedings in his holding cell as directed.  Instead, he had flooded the cell and banged his head against the wall until he drew blood.  The court ordered Clark returned to the courtroom.  When he returned, Clark made several requests to go back to jail.  The court found that Clark had "voluntarily waived [his] right to be present for this trial on more than one occasion," allowed him to return to jail, and proceeded with trial.

Clark returned to the courtroom for the remaining two days of trial.  The jury found him guilty on all twelve counts.  The court sentenced Clark to 919 months of imprisonment.

## II.

Clark first contends that his waiver of the right to counsel and the right to be present at trial were invalid.

## A.

Clark argues his waiver of the right to counsel was invalid because the district court was unaware of its authority to question his competency to waive the right.  More specifically, Clark infers from the district court's statement "I can't force you to have the attorney[,]" that the court was unaware that, although Clark was competent to stand trial, the court nevertheless had discretion to inquire whether Clark had the separate mental competency to represent himself.  Clark reads the court's statement out of context.

Before a district court accepts a waiver of counsel, it "'must ask the defendant a series of questions drawn from, or substantially similar to, the model inquiry set forth in the *Bench Book for United States District Judges*.'"[1]  *United States v. Ross*, 703 F.3d 856, 867 (6th Cir. 2012) (quoting *United States v. Williams*, 641 F.3d 758, 766 (6th Cir. 2011)).  Here, the district court conducted the required colloquy, suggesting it was aware it could deny Clark's request.

During the colloquy, the district court pressed Clark on his request, inquiring whether he had any legal training, had ever tried a case, or had any familiarity with the Rules of Evidence. Clark displayed an understanding of the charges against him and the possible sentences, and acknowledged he knew the facts of his case.

The court also cautioned Clark on the consequences of self-representation and urged him to keep his appointed counsel.  The court reminded him that he did not "know anything about the law" and that a "trained lawyer could defend you far better than you think you can defend yourself."  The court advised Clark that it would hold him to the same legal standards as the Government's lawyers.

Despite the court's urgings, Clark persisted in his request, which he said he had voluntarily made.  And after again advising Clark that he should keep his attorney, the court granted Clark's request, concluding, "You don't seem to want [an attorney].  I can't force you to have the attorney."  Fairly read, the record shows that the court found that it could not "force" Clark to keep his attorney because it had determined that he validly waived his right to counsel.

Clark also suggests that, based on his responses to the court and his mental-health history, the court had reason to doubt his competence to represent himself and, therefore, should have

---

[1] *See* Fed. Jud. Ctr., *Benchbook for U.S. District Court Judges* § 1.02(C) (6th ed., Mar. 2013), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/Benchbook-US-District-Judges-6TH-FJC-MAR-2013-Public.pdf/$file/Benchbook-US-District-Judges-6TH-FJC-MAR-2013-Public.pdf.

made further inquiry into his competence to do so. We review for abuse of discretion whether there was reasonable cause to question a defendant's competence to waive counsel. *United States v. Abdulmutallab*, 739 F.3d 891, 903 (6th Cir. 2014) (citing *United States v. Ross*, 703 F3d 856, 867 (6th Cir. 2012)).

Clark clearly and lucidly engaged in the colloquy with the court. He understood the risks of self-representation, the charges against him, and the possible sentences he faced. Even after the court accepted the waiver, Clark's conduct continued to raise no doubts. At various times, the court explained how the trial would proceed, and Clark responded with appropriate questions. He participated in jury selection, provided an opening statement, stated objections, and conducted cross-examinations. The court even praised him on his performance at the conclusion of the first day. We conclude the court had no reason to doubt Clark's mental competency to represent himself.

Finally, Clark argues for reversal because the district court did not know it could have rejected Clark's request for self-representation because the request was untimely. The record does not suggest the court was unaware of its options.

**B.**

Clark next asserts that the district court violated his right to be present at trial when it first removed him from the courtroom, arguing that his conduct was not so disruptive as to justify removal.

This court has recognized that district courts have discretion to employ the best method for dealing with disruptive defendants, *Gray v. Moore*, 520 F.3d 616, 623 (6th Cir. 2008) (citing *Illinois v. Allen*, 397 U.S. 337, 343 (1970)), and that "district courts are vested with power to control their courtrooms," *United States v. Meacham*, 65 F. App'x 529, 533 (6th Cir. 2003)

(reviewing summary criminal contempt finding and sentence). We review the district court's

exercise of its authority to control its courtroom for abuse of discretion. *Id.* at 533–34; *United*

*States v. Powers*, 500 F.3d 500, 506 (6th Cir. 2007) (citing *McMillan v. Castro*, 405 F.3d 405,

409 (6th Cir. 2005)). "It is an abuse of discretion for a district court to commit legal error or find

clearly erroneous facts." *United States v. Ford*, 761 F.3d 641, 651 (6th Cir. 2014) (internal

quotation marks omitted). If the court erred, we ask whether the error was harmless. *See United*

*States v. Gallagher*, 57 F. App'x 622, 627 (6th Cir. 2003).

"A defendant's right to be physically present at every stage of his trial has a longstanding

tradition in this country's criminal jurisprudence, with roots in both the Due Process Clause and

the Confrontation Clause of the Sixth Amendment." *Gray*, 520 F.3d at 622 (citing *Allen*,

397 U.S. at 338; *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)). That right, however, is not

absolute. *Id.* A defendant waives his continued presence at trial "if, after he has been warned by

the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists

on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that

his trial cannot be carried on with him in the courtroom." *Allen*, 397 U.S. at 343; *see also* Fed.

R. Crim. P. 43(c)(1)(C).

The record does not support Clark's contention that his behavior was not disruptive.

During the second day of trial, Clark stood, prompting the court to ask: "By standing up, are you

telling me that you will not be quiet and you will be disruptive? You may be seated. Are you

going to be compliant with the Court's orders?" Clark did not comply. The court then cautioned

him:

> [I]f you'll just behave, we will leave you here. Otherwise, I'm going to be forced
> to remove you to the facility where you can see what's going on here and hear
> what's going on here. And if you change your mind and decide that you will
> behave and not be disruptive, then we can bring you back.

The court again asked Clark to sit. And after the third request—and third refusal to comply—the court had Clark removed from the courtroom. The court made clear that if Clark would "follow the direction[s] of the Court and not be disruptive," he could return. The court expressly found that Clark's noncompliance interfered with its ability to carry on with the trial, and that finding is not clearly erroneous.

Further, Clark was not involuntarily removed from the courtroom; rather he affirmatively waived his right to be present. As with other constitutional rights, a defendant can waive the right to be present if the waiver is "knowing and voluntary." *United States v. Riddle*, 249 F.3d 529, 534 (6th Cir. 2001) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); *see also* Fed. R. Crim. P. 43(c)(1)(A). Several times, Clark expressed to the court his desire to return to jail. When the court finally ordered him removed, Clark neither indicated a desire to remain nor did he accept the court's invitation to return if he decided he would "act appropriately in the courtroom." After the disturbance in the holding cell, Clark asked to go back to jail at least seventeen times. The district court allowed Clark to leave after finding that Clark waived his right to be present "on more than one occasion." Thus, we find no error, and any alleged error is waived.

## III.

Clark next argues the district court erred when it allowed the jury to hear evidence regarding bloodstains found on Vernon's truck and on clothes found in the truck and Clark's mother's statement that Clark told her he killed a person. Clark asserts the evidence was irrelevant, and that even if relevant, the danger of unfair prejudice from the evidence substantially outweighed its probative value, because the evidence, taken together, left the jury with the impression that he had killed someone. Clark Br. 24, 28. This court generally reviews a

ruling on the admissibility of evidence for abuse of discretion. *United States v. Tragas*, 727 F.3d 610, 614 (6th Cir. 2013) (citing *United States v. Yu Qin*, 688 F.3d 257, 261 (6th Cir. 2012)); *cf. United States v. Bell*, 516 F.3d 432, 440 (6th Cir. 2008) (reviewing Rule 404(b) determination under a three-part test).

Federal Rule of Evidence 404(b) bars "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The Rule "does not apply to evidence that is 'intrinsic to' or 'inextricably intertwined with evidence of' the central alleged wrong," *Flagg v. City of Detroit*, 715 F.3d 165, 175 (6th Cir. 2013) (citing *United States v. Henderson*, 626 F.3d 326, 338 (6th Cir.2010)). Intrinsic evidence includes acts that are "part of a single episode" and

> "background evidence" that "has a causal, temporal or spatial connection with the charged offense, is a prelude to the central allegation, is directly probative of the central allegation, arises from the same events as the central allegation, forms an integral part of a witness's testimony, or completes the story of the central allegation."

*Id.* at 175–76 (quoting *United States v. Gonzalez*, 501 F.3d 630, 639 (6th Cir. 2007); *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000)).

Federal Rule of Evidence 403 allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. "Unfair prejudice 'does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis.'" *Ford*, 761 F.3d at 648 (quoting *United States v. Gibbs*, 182 F.3d 408, 430 (6th Cir. 1999)).

We need not decide whether the district court properly admitted all or part of the evidence because we conclude any error is harmless. "Error is 'harmless unless it is more probable than not that the error materially affected the verdict.'" *United States v. Pritchett*, 749 F.3d 417, 433 (6th Cir. 2014) (quoting *United States v. Clay*, 667 F.3d 689, 700 (6th Cir. 2012)). "[A]dmission of evidence of prior bad acts is 'harmless error' if the record evidence of guilt is overwhelming, eliminating any fair assurance that the conviction was substantially swayed by the error." *Clay*, 667 F.3d at 700 (quoting *United States v. Hardy*, 643 F.3d 143, 153 (6th Cir. 2011)).

The jury heard ample evidence to support that Clark intended to kill or seriously injure his carjacking victims. For example, the jury heard his other, unchallenged admission to Ruth Ann Millican that he "done killed two people." It also heard Millican testify that Clark aimed a gun at her and pulled the trigger, and that Clark robbed Earl Millican at gunpoint. The jury additionally heard Clark's statements that he "was going out in a blaze of glory," had "nothing to lose," and was not "going back to jail." We conclude any error in admitting the challenged testimony was harmless.

Finally, Clark asserts that the district court violated the Confrontation Clause when it admitted, through the bystander, his mother's statement that "he killed somebody." The parties agree that this court reviews Confrontation Clause challenges de novo. *United States v. Boyd*, 640 F.3d 657, 665 (6th Cir. 2011).[2]

The Confrontation Clause generally bars the admission of testimonial out-of-court statements. *Id.* (citing *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004)). "A statement is

---

[2] A reported decision of this court recently stated that "[w]e review for abuse of discretion a challenge to the district court's evidentiary rulings, even on Confrontation Clause grounds." *Ford*, 761 F.3d at 651. Under either the abuse-of-discretion or de novo standard of review, we conclude there was no Confrontation Clause violation.

testimonial if a reasonable person in the declarant's position would have anticipated the use of the statement in a criminal proceeding." *Id.* (citing *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004)).

A reasonable person in Clark's mother's position would not have anticipated that the Government would use her statement in a criminal proceeding. She made the statement to a bystander who had just witnessed Clark crash the Cadillac into a telephone pole. After the crash, the bystander approached Clark's mother, who was sitting in the passenger seat of the Cadillac, and who the bystander described as "an older woman with oxygen," out of concern—"to see how she was." She was "hysterical and crying and having a hard time breathing." He assumed she was another carjacking victim, and asked "[D]id he hurt you?" She responded, "[N]o, I'm fine. That's my son. He just told me he killed somebody." The statement is a classic excited utterance and was "not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 131 S. Ct. 1143, 1155 (2011). It is non-testimonial hearsay, and the court did not err when it admitted the statement.

## IV.

Clark also challenges his sentence. Among other offenses, the jury convicted Clark of felon-in-possession of a firearm, 18 U.S.C. § 922(g)(1), and fugitive-in-possession of a firearm, 18 U.S.C. § 922(g)(2). A violation of 18 U.S.C. § 922(g) usually carries a ten-year maximum term of imprisonment. 18 U.S.C. § 924(a)(2). However, under the Armed Career Criminal Act (ACCA), if a defendant has "three previous convictions . . . for a violent felony . . . committed on occasions different from one another," the ACCA imposes a mandatory fifteen-year minimum sentence. § 924(e)(1). Multiple prior convictions must involve separate criminal episodes to trigger the ACCA's sentence enhancement. *United States v. Martin*, 526 F.3d 926, 938 (6th Cir.

2008). Clark asserts that the district court erroneously found that two of his prior felonies arose from separate criminal episodes. This court reviews "de novo a district court's determination that a defendant should be sentenced as an armed career criminal." *United States v. Vanhook*, 640 F.3d 706, 709 (6th Cir. 2011) (internal quotation marks omitted).[3]

> A defendant commits felony offenses on different occasions if:
>
> (1) it is possible to discern the point at which the first offense is completed, and the subsequent point at which the second offense begins; (2) it would have been possible for the offender to cease his criminal conduct after the first offense; or (3) the offenses are committed in different residences or business locations.

*United States v. Jones*, 673 F.3d 497, 503 (6th Cir. 2012). The court must consider the totality of the circumstances when applying the *Jones* test. *United States v. Mann*, 552 F. App'x 464, 470 (6th Cir. 2014). "[G]enerally when a defendant is evading or resisting arrest for an offense immediately following that offense, we will view subsequent offenses arising out of the evasion or resistance as part of the same criminal episode." *Id.* at 470.

In October 1994, Clark was involved in a police chase that crossed county lines. Police pursued Clark after he drove away from a gas station without paying. During the chase, Clark intentionally drove towards a Texas State Trooper. He then continued to drive, crossed county lines, and again intentionally drove towards another law enforcement officer. Clark was indicted in both counties for aggravated assault on a Texas State Trooper. He pleaded guilty in both jurisdictions and received five-year prison terms for each offense.

---

[3] This court has elsewhere said that "where the inquiry turns upon the determination whether the defendant's prior convictions are distinct criminal episodes that should be counted separately under statutory provisions, the standard of review is clear error." *United States v. Martin*, 526 F.3d 926, 938 (6th Cir. 2008) (citations omitted). We discern clear error here.

Based on these convictions—and a third in Tennessee for facilitating a robbery—the presentence report (PSR) treated him as a career offender and calculated the guidelines range as 292 to 365 months, in addition to consecutive statutory mandatory sentences totaling 57 years.

At sentencing, Clark argued his prior convictions did not qualify under the ACCA. The district court concluded that the PSR's armed-career-criminal calculation was "technically correct," even though it found that the convictions arose from "one event in which two crimes occurred in different counties." It noted that the ACCA would not have applied to Clark had the assaults occurred in the same county. Reasoning that Clark's situation was "atypical," the court exercised its discretion and sentenced Clark based on a category IV criminal history (rather than category VI), resulting in a guidelines range of 235 to 293 months. The court imposed concurrent 235-month terms for each of the two counts eligible for enhancement under the ACCA.

As the district court found, Clark's two assaults occurred during one "continuous chase." Generally, when a person is evading or resisting arrest immediately following the actions giving rise to the arrest, subsequent offenses arising out of the evasion or resistance are part of the same criminal episode. *Mann*, 552 F. App'x at 470. Because Clark assaulted the two troopers while attempting to evade arrest, we conclude that the resulting aggravated assault convictions were part of the same criminal episode, and the ACCA does not apply.

Notwithstanding, there is no need for resentencing because the error did not affect Clark's aggregate sentence of 919 months' imprisonment. After the court applied the enhancement, it varied downward from the Guidelines and sentenced Clark under a criminal history category IV, the Guidelines range without the ACCA enhancement. Although the 235-month sentences on the two § 922(g) counts at issue here—counts five and six—are in excess of

-15-

the statutory maximum in the absence of the ACCA enhancement, the court also imposed 235-month sentences on counts nine and ten, all running concurrent with each other. Therefore, the district court's ACCA ruling did not control the duration of Clark's confinement. But, because the judgment provides that the court sentenced Clark to 235 months' imprisonment on counts five and six, in excess of the statutory maximum of 120 months, we remand to the district court to correct the judgment.

## V.

For the reasons stated, we **AFFIRM** Clark's conviction and sentence and **REMAND** for the administrative task of correcting the judgment.