RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0283p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JOHN J. PUDELSKI,

        *Petitioner-Appellant,*

    *v.*

JULIUS WILSON,

        *Respondent-Appellee.*

No. 07-3856

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-01441—Donald C. Nugent, District Judge.

Argued: April 22, 2009

Decided and Filed: August 14, 2009

Before: CLAY and McKEAGUE, Circuit Judges; HOLSCHUH, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Edwin J. Vargas, THE VARGAS LAW FIRM, Cleveland, Ohio, for Appellant. Thelma Thomas Price, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Edwin J. Vargas, THE VARGAS LAW FIRM, Cleveland, Ohio, for Appellant. Thelma Thomas Price, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

    HOLSCHUH, D. J., delivered the opinion of the court, in which McKEAGUE, J., joined. CLAY, J. (pp. 26-32), delivered a separate dissenting opinion.

---

[*] The Honorable John D. Holschuh, United States District Judge for the Southern District of Ohio, sitting by designation.

---

**OPINION**

---

HOLSCHUH, District Judge.   Petitioner John J. Pudelski ("Pudelski") was convicted in state court of the murder of his infant daughter, and after appealing that conviction to the state courts he filed a 28 U.S.C. § 2254 petition for habeas corpus relief.  The district court, adopting the magistrate judge's Report and Recommendation in full, found no merit in Pudelski's claims and dismissed the petition.  Pudelski now appeals.  Although the magistrate judge and district court improperly found that habeas relief was not available to Pudelski on his first ground for relief, we reach the merits of that ground and find that it does not warrant habeas relief.  Additionally, we find no merit in Pudelski's second ground for relief, and consequently we affirm the dismissal of Pudelski's habeas petition.

**I.**

The Ohio Eighth District Court of Appeals found the following facts on direct appeal, and we accept them as true because they are unrebutted, *see* 28 U.S.C. § 2254(e)(1):

> John J. Pudelski was charged in a two-count indictment filed April 14, 1999.  Count one charged him with aggravated murder in violation of R.C. 2903.01 specifically, purposely causing the death of his infant daughter, Ellie Marie Pudelski.  Count two charged him with murder; that is, causing the infant's death as a proximate result of committing or attempting to commit felonious assault, a first or second degree felony that is an offense of violence.

> [Pudelski] moved the court to suppress oral statements he made to the police, to dismiss the death penalty specification on count one, and to dismiss the murder charge contained in count two of the indictment. After a hearing on the motion to suppress, the court denied all three motions.  However, the state was given leave to remove the death penalty specification from the indictment on July 23, 1999.

> The case proceeded to trial on August 23, 1999.  In addition to the charges of murder and aggravated murder, the jury was also

instructed on the lesser included offense of involuntary manslaughter as a proximate result of child endangering.  The jury returned a verdict finding [Pudelski] not guilty of aggravated murder but guilty of murder.  The court sentenced him to fifteen years' [sic] to life imprisonment and overruled his motions for acquittal and for a new trial. [Pudelski] timely appealed his conviction and the denial of his post-verdict motions.

In the state's case at trial, the jury heard testimony from [Pudelski's] wife (who was also the mother of the infant victim), medical personnel involved in the delivery and postnatal care of the infant, paramedic and emergency room personnel who responded to the 9-1-1 call regarding the child's death, the county coroner and assistant coroner, and a police officer who investigated the matter.

The mother testified that the infant girl was delivered by Caesarian section on March 17, 1999, and she took her home four days later.  The infant fed [sic] every four hours, approximately two and one-half to three ounces of formula or breast milk at each feeding, and behaved normally.  The mother never noticed any injury to the infant's head.

The neonatologist who was present at the infant's birth had noted a caput or bruise under the scalp but above the skull bone on the back of her head.  This is a common injury in newborns and does not have any serious effects on the infant's health.  A pediatrician who saw the infant on March 18 and 20 reported that he saw no abnormalities.  He would not necessarily have noted a caput in his records unless it was an unusual one.   He did not note one here.   Neither physician noted any cepahlohematoma, or swelling and bleeding of the tissue under the bone, which would have been a more serious injury.  A home nurse reported that the baby appeared normal and had no bumps or bruises on her head when the nurse saw her on March 23.

The mother testified that the baby behaved normally throughout the day of Sunday, March 28, 1999.  The mother fed her at 8:00 or 9:00 p.m.; the baby consumed almost three and one-half ounces at that time.  The mother put the baby to bed at approximately 9:30 p.m., then took a cough medication, Nyquil, and went to bed herself.  The baby's crib was located in the mother's bedroom.

The mother awakened around 12:00 midnight when the baby cried and got up to feed the child. [Pudelski], her husband, was not in the room when the mother awakened but came in and offered to feed the baby, although he normally went to bed at that time.  This was the first time he had fed the baby; he normally paid no attention to her.  The mother then went back to sleep.

The mother awakened at 7:00 a.m. and was immediately concerned because the child had not awakened for her normal feeding at 4:00 a.m. She went to the crib and found the baby in a corner with her head against the bumper pad. Her forehead was cold. The mother picked the baby up and felt for a heart beat but felt none. She observed a lump on the side of the baby's head.

The mother began to yell for [Pudelski] to wake up. It was unusual for [him] to be sleeping at this time; he was usually up at 6:30 a.m. [Pudelski] jumped up and took the baby from the mother and left the room, returning with the telephone. He ordered the mother to leave the bedroom and wait in the living room for paramedics to arrive.

Paramedics came and took the baby to Euclid Hospital. [Pudelski] and his wife delayed going to the hospital while [Pudelski] woke his two daughters from a prior marriage and readied them for school, then took them to his mother's house. [Pudelski] and his wife proceeded from there to the hospital.

At the hospital, they learned that the baby was dead. They went into a room to see the body, but [Pudelski] would not look at her. As they waited in the grieving room for the mother's mother to arrive, [Pudelski] said to his wife, Please don't leave me.

The coroner and assistant coroner testified that the baby died as a result of a cerebral edema, or swelling of the brain, which was caused by a blunt impact that also caused a fracture of the skull. They estimated the time of death at approximately 3:00 a.m., and approximately two to three hours after the injury was inflicted. They opined that she was injured after her midnight feeding. The assistant coroner testified that the child would have survived if medical attention had been sought immediately after the injury occurred.

The coroner and assistant coroner both opined that the fracture occurred very recently, certainly less than twenty-four hours before the baby's death. There were no signs of healing around it; the edges of the break were sharp and uncalloused and there was fresh blood at the site. There were no macrophages (clean-up cells) at the site of the fracture, though there were some in the adjacent scalp. They opined that these macrophages were present because of the caput that occurred at birth. There was no evidence the fracture was a new break at the same site as a fracture that had occurred earlier. Macrophages would have been present at the fracture site if the fracture were [sic] not new. The fracture could not have occurred after death because the body had to have been alive to pump the fresh blood that had oozed around the area.

The coroner opined that the death was a homicide. She reached this conclusion because the child had a fracture that was not a birth injury, she could not have caused the fracture herself, and nothing accidental had happened, so the injury had to have been inflicted.

Detective Raymond Jorz testified that [Pudelski] and his wife came in to the police station together voluntarily on March 31, 1999, and were interviewed separately. [Pudelski] was interviewed by Detective Jorz and Lieutenant Brooks. They asked [Pudelski] whether the baby had suffered any accidental injuries, and [Pudelski] said she had not. [Pudelski] related that he had fed the baby around midnight and stayed up with her until approximately 1:30 a.m., then put her in the crib after she went to sleep. He went to bed himself and awakened at approximately 3:30 a.m., used the bathroom, then returned to bed. He did not check on the baby at that time. His wife woke him up the following morning after she had found the baby cold and unresponsive.

When police informed [Pudelski] that the baby had a skull fracture, [Pudelski] suggested that the fracture was caused by the emergency medical technicians or that the coroner was examining the wrong child. He denied knowledge of any injury.

*State v. Pudelski*, No. 77172, 2001 WL 259215, at **1-3 (Ohio Ct. App. Mar. 15, 2001).

The jury convicted Pudelski of one count of murder, in violation of R.C. 2903.02(B), on September 4, 1999. He filed a motion for a judgment of acquittal or for a new trial on September 10, 1999, arguing that the verdict was not sustained by sufficient evidence and was rather based on impermissible double inferences. JA 90-104. The trial court overruled this motion on September 17, 1999, and on the same day sentenced Pudelski to 15 years to life in prison. JA 112.

Pudelski then filed a motion for a new trial based on newly discovered evidence pursuant to Ohio Criminal Rule 33(A)(6) on October 1, 1999. The day before his sentencing, Pudelski's mother had discovered an undeveloped roll of film in her house that, when developed, contained photographs of Pudelski's daughter the day after her birth. One photograph showed a large red bruise on the back right side of the infant's head which, according to Pudelski, corresponds to the area in which the skull fracture that ultimately killed the child had occurred. Pudelski argued that this photograph was new evidence proving that the infant suffered a "significant injury" during birth. His

expert witnesses had theorized at trial that such an injury had occurred but could offer no definitive proof of it, a fact that the State emphasized in its closing arguments. Pudelski argued that this injury, as shown on the photograph, actually caused the infant's eventual death, thus exonerating him. Pudelski relied entirely on state law when making his motion, most notably Ohio Criminal Rule 33(A)(6) and *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947).[1]  JA 113-26.

The State opposed the motion on the grounds that the photograph did not have a strong probability of changing the outcome of the trial, and that the photograph was cumulative evidence. JA 135-53. The State argued that numerous witnesses present for the child's delivery noted the presence of a large bruise or caput on the back right side of the infant's head, making the photograph cumulative evidence. The trial court denied the motion on December 17, 2000 on the grounds that the photograph was cumulative to the trial testimony establishing that the infant did in fact have a large bruise or caput on her head when born. The trial court also concluded that the photograph would not have changed the outcome of the trial. JA 1728-33. The trial court, like Pudelski, relied solely on Ohio law when denying Pudelski's motion for new trial.

Pudelski appealed his conviction to the Eighth District Court of Appeals on October 28, 1999, and because his motion for a new trial based on newly discovered evidence was still pending he moved for a stay of the appeal. Appellee Br. p. 9. The court of appeals granted that motion and, after the motion for a new trial was resolved and after Pudelski supplemented the appellate record, the court of appeals heard the appeal. *Id*. Pudelski raised eight assignments of error on appeal; most relevant to the instant habeas petition, Pudelski argued that the trial court erred when denying his motion for a new trial based on newly discovered evidence, and that the trial court

---

[1]Ohio Criminal Rule 33(A)(6) states: "A new trial may be granted on motion of the defendant . . . (6) When new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial." *State v. Petro* states: "To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." 148 Ohio St. at 505 (syllabus).

abused its discretion and prejudiced him when ruling on various evidentiary issues, including a ruling denying him the opportunity to review the police report upon which the coroner relied in reaching her conclusions and in admitting the coroner's expert testimony. Pudelski relied entirely on state law when arguing for relief based on these two assignments of error. With respect to the denial of his motion for new trial, Pudelski again relied on Ohio Criminal Rule 33(A)(6) and *State v. Petro*. With respect to the admission of the coroner's expert testimony and the denial of his request to review the police reports, Pudelski relied on Ohio evidentiary law. JA 166-88.

The court of appeals affirmed the trial court in all respects in an opinion issued on March 15, 2001 and journalized on April 3, 2001. *Pudelski*, 2001 WL 259215; JA 166-88. The court of appeals found that the newly discovered photograph was cumulative; that the trial court did not abuse its discretion in denying the motion for a new trial; and that the trial court did not abuse its discretion in ruling on the evidentiary issues. *Id*. The court of appeals, like Pudelski, relied on and interpreted only state law when affirming the trial court. Pudelski filed a motion for reconsideration and a motion to reopen the appeal, both of which the court of appeals denied, Appellee Br. p. 12-14, and he also filed an appeal to the Supreme Court of Ohio, JA 189. As on direct appeal, Pudelski relied entirely on state law when seeking review by the Supreme Court of Ohio. JA 189-204. The Supreme Court of Ohio declined to exercise jurisdiction on July 25, 2001, *State v. Pudelski*, 92 Ohio St. 3d 1445, 751 N.E.2d 483 (Table) (2001), and denied Pudelski's motion for reconsideration on October 10, 2001, *State v. Pudelski*, 93 Ohio St. 3d 1453, 756 N.E.2d 116 (Table) (2001).

Pudelski then filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Ohio on July 25, 2002. JA 7. In the petition, Pudelski presented five grounds for relief:

1.     The Trial Court Erred in Denying [Pudelski's] Motions for New Trial Based on Newly Discovered Evidence.

2.     The Trial Court Erred in Prohibiting [Pudelski] and His Trial Counsel from Having Access to the Files and Records upon

Which the State's Expert Witness Relied in Her Expert Testimony.

3.    The Trial Court Erred in Allowing the Prosecution's Witness, Assistant County Coroner, Dr. Joseph Felo to Testify Relative to His Unscientific and Personal Research in a Manner So as to Present Such Research as Scientific Evidence.

4.    The Trial Court Erred in Denying Petitioner's Motion to Dismiss Count 2 of the Indictment - as Death Resulting from Felonious Assault Constitutes Involuntary Manslaughter in Violation of R.C. 2903.04(a), Which [sic] Precludes an Indictment for Murder under R.C. 2903.02(b) under Ohio Law.

5.    The Trial Court Erred in Refusing the Jury's Request - Based upon Inconvenience to the Court - to View Microscope Slides Which Had Been Admitted into Evidence and Had Been Delivered to the Jury for Use During its Deliberations.

JA 7-15. Pudelski moved to stay the habeas proceedings, however, to allow him to return to state court to exhaust state remedies that he conceded were available and unexhausted relative to his fifth ground for relief. The district court granted this motion on March 20, 2003, JA 289-90, and on April 21, 2003 Pudelski filed a petition to vacate or set aside the judgment in the state trial court pursuant to R.C. § 2953.21, based on the arguments presented by his fifth ground for habeas relief, Appellant Br. p. 3. The state trial court denied the petition on February 16, 2005. Pudelski appealed this denial to both the Eighth District Court of Appeals, which affirmed the trial court, *State v. Pudelski*, No. 85989, 2006 WL 440271 (Ohio App. 8th Dist. Feb. 23, 2006), and the Supreme Court of Ohio, which declined to exercise jurisdiction, *State v. Pudelski*, 110 Ohio St. 3d 1439, 852 N.E.2d 188 (Table) (2006).

Pudelski then returned to district court and moved to lift the stay, which motion was granted on February 20, 2007. JA 271. The magistrate judge issued a Report and Recommendation on April 24, 2007, recommending that the district court deny Pudelski's petition in its entirety. JA 263-88. With respect to the first ground for relief, the State argued that the district court did not have jurisdiction over that claim because it presented a question of state law only and did not claim that Pudelski was in custody in violation of federal law. The magistrate judge found that the district court did in fact

have jurisdiction over the first ground for relief because Pudelski "frame[d] his first ground for relief as a federal claim" by arguing that the denial of the motion for a new trial denied him a fundamentally fair trial and thus violated his right to due process. JA 272. The magistrate judge, however, then found that the court could not grant Pudelski relief on this ground because this ground for relief alleged a constitutional violation in the ruling on his motion for a new trial, which the magistrate judge found was a post-conviction proceeding. The magistrate judge relied on *Kirby v. Dutton*, 794 F.2d 245, 246-47 (6th Cir. 1986), for the proposition that federal habeas relief is not available to remedy alleged errors in state post-conviction proceedings, and recommended that the district court deny Pudelski's first ground for relief. JA 273-74. The magistrate judge did not reach the merits of Pudelski's first ground for relief.

Turning to Pudelski's other grounds for relief, the magistrate judge first addressed the State's claim that Pudelski had procedurally defaulted those grounds. The magistrate judge held that Pudelski had exhausted his state remedies because he had none remaining, JA 275, and then addressed the issue of procedural default. The magistrate judge did not explicitly conclude that Pudelski had in fact procedurally defaulted any grounds for relief, but rather concluded that any procedural default should be excused pursuant to *Schlup v. Delo*, 513 U.S. 298, 320-21 (1995) (stating that a federal habeas court must consider the merits of procedurally defaulted claims when failure to do so would result in a fundamental miscarriage of justice) because, in the magistrate judge's opinion, Pudelski had made at least a colorable claim of actual innocence. The magistrate judge thus examined the merits of Pudelski's remaining grounds for relief. JA 275-77.

The magistrate judge recommended denying Pudelski's second ground for relief because, even assuming that the trial court's decision to prevent Pudelski from reviewing the police report on which the coroner relied to give her expert opinions violated Ohio's evidentiary rules, the magistrate judge concluded that the ruling did not deprive Pudelski of due process and a fundamentally fair trial. JA 281. The magistrate judge found that the information contained in the police report was presented and available for

examination during the trial by other means, and that granting Pudelski access to the police report would not have changed the outcome of the trial. The magistrate judge also found that the trial court's decision did not violate *Brady v. Maryland*, 373 U.S. 82 (1963), because there was no indication that the police report contained information favorable to Pudelski. JA 282. The magistrate judge recommended that the district court deny Pudelski's other three grounds for relief on the grounds that he had not shown that the alleged errors in the trial violated due process and made the trial fundamentally unfair. JA 283-88.

Pudelski objected to the magistrate judge's conclusions and recommendations. JA 294. The district court reviewed the Report and Recommendation and the petition de novo, and on May 30, 2007 issued its opinion. The district court found no merit in Pudelski's objections and thus overruled them, instead adopting the magistrate judge's Report and Recommendation in full and denying Pudelski's petition for a writ of habeas corpus. Additionally, the district court refused to issue a certificate of appealability after finding that an appeal could not be taken in good faith. *Pudelski v. Wilson*, No. 1:02-cv-1441, 2007 WL 1592099 (N.D. Ohio May 30, 2007). Pudelski appealed to this Court on June 18, 2007 and moved for a certificate of appealability, which this Court granted only as to the first two grounds for relief in the habeas petition.

## II.

We discuss first the issue of procedural default. Ordinarily, state prisoners must exhaust available state remedies by, among other things, fairly presenting their federal claims to the state courts before petitioning for a federal writ of habeas corpus. *See* 28 U.S.C. § 2254(b), (c); *Whiting v. Burt*, 395 F.3d 602 (6th Cir. 2005). Due to longstanding policies of comity and respect between state and federal courts, a habeas petitioner must give the state courts the first opportunity to consider and rule upon the federal claims the prisoner wishes to use to attack his state court conviction. *Picard v. Connor*, 404 U.S. 270, 275 (1971). A petitioner need not cite federal law "book and verse" to fairly present a claim, *id*. at 278, but the factual and legal underpinnings of the

claim must be presented as a federal claim to the state courts, *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).

In situations in which a petitioner has failed to fairly present federal claims to the state courts, and a state procedural rule now prohibits the state court from considering them, the claims are considered procedurally defaulted. *Martin v. Mitchell*, 280 F.3d 594, 603 (6th Cir. 2002). While in such situations the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts results in a procedural default of those claims that bars federal court review. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

In this case, it appears that both of Pudelski's claims are procedurally defaulted because he failed to timely present them as federal claims to the state courts. Pudelski has framed his claims to the district court and this Court as federal claims, but before the state courts he framed his arguments solely in terms of Ohio law governing motions for new trial and evidentiary issues and never argued that any of his federal rights had been violated. The Sixth Circuit has identified four actions significant to determining whether a claim has been fairly presented to the state courts, *see McMeans*, 228 F.3d at 681 (relying on federal cases employing constitutional analysis, relying on state cases employing federal constitutional analysis, phrasing the claim in terms of constitutional law, or alleging facts well within the mainstream of constitutional law), and a review of the record reveals that Pudelski has taken none of these actions. Counsel for Pudelski conceded as much during oral argument, but contended that Pudelski's federal fair trial and due process claims were "pervasive" throughout his state court arguments. However, "[g]eneral allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific constitutional rights were violated." *Id*. Furthermore, state procedural rules now prohibit Pudelski from attempting to raise his federal arguments before the state courts, as he has already taken his direct appeal and the time for either moving to reopen the appeal or for filing a state habeas corpus petition

has expired.  *See* Ohio Rule of Appellate Procedure 26(B); Ohio Rev. Code § 2953.21(A)(1)(a).  Pudelski's claims, while technically exhausted, would thus appear to be procedurally defaulted.

However, exhaustion and procedural default are not jurisdictional limitations, *see Cain v. Redman*, 947 F.2d 817, 820 (6th Cir. 1991), and in this instance we elect to excuse the apparent default.  Although the State argued procedural default to the district court and magistrate judge, the State did not renew this issue on appeal and the parties have not briefed it.  Based on the record before us we decline to decide the issue and decline to dismiss Pudelski's petition for procedural default, especially because we find that the district court's opinion dismissing Pudelski's petition can be affirmed on the merits.  *See*, *e.g.*, *Linscott v. Rose*, 436 F.3d 587, 592 (6th Cir. 2006).[2]

### III.

The magistrate judge and district court both found that habeas relief was not available to Pudelski on his first ground for relief for the reason that federal habeas relief is not available to remedy alleged errors in state post-conviction proceedings.  We hold, however, that motions for new trial filed before a state defendant initiates his or her state direct appeal, and subsequently reviewed during that direct appeal, are not post-conviction proceedings and do not preclude a federal habeas court from reviewing the denial of the motion for new trial for constitutional error.  However, on the merits, we

---

[2]The magistrate judge and district court also excused any procedural default Pudelski may have committed, but on the ground that Pudelski had made at least a "colorable" showing of actual innocence that, pursuant to *Schlup v. Delo*, 513 U.S. 298 (1995), allowed Pudelski's claims to be considered on their merits in order to avoid a fundamental miscarriage of justice.  JA 275-77.  Although we too excuse Pudelski's procedural default, we take this opportunity to note that the magistrate judge misapplied *Schlup*. A federal court has a duty to consider the merits of a procedurally defaulted claim if failure to do so would result in a fundamental miscarriage of justice.  This exception to the procedural default rule, however, is exceedingly narrow and is reserved for extraordinary cases in which a petitioner can show that a constitutional violation has probably resulted in the conviction of a factually innocent person. *Schlup*, 513 U.S. at 321; *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  To establish a claim of actual, factual innocence, the petitioner must present new evidence that "show[s] that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 327. The Supreme Court has recently stated that "it bears repeating that the *Schlup* standard is demanding and permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538 (2006).  The magistrate judge's finding that Pudelski's "at least colorable" actual innocence claim satisfied this demanding standard was erroneous; a claim of actual innocence must be more than simply "colorable" to invoke the *Schlup* gateway.  Furthermore, as we explain below in section III.B.2, even if the magistrate judge had applied the proper standard, Pudelski's new evidence does not make it more likely than not that no reasonable juror would have convicted him and thus does not satisfy the *Schlup* standard.

find that Pudelski was not denied due process or a fundamentally fair trial when his motion for new trial was denied. Additionally, we find that Pudelski's second ground for relief is meritless, as the state trial court's evidentiary rulings did not deny Pudelski a fundamentally fair trial and did not violate *Brady v. Maryland*.

**A.      Standard of Review**

A district court's decision to grant or deny a habeas petition is reviewed de novo. *Northrop v. Trippett*, 265 F.3d 372, 376 (6th Cir. 2001). A federal court's analysis of a habeas petition challenging a state court decision is governed by the standards set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"). That statute, in relevant part, amended 28 U.S.C. § 2254(d) to read:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]

The relevant state court decision is the last state court to adjudicate the claim on the merits, and this court reviews the decision of "the last state court to issue a reasoned opinion on the issue." *Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006). In this case, that is the Eighth District Court of Appeals' decision, because the Ohio Supreme Court declined to review Pudelski's claims without comment.

Section 2254(d)(1) contains two separate clauses: a "contrary to" clause, and an "unreasonable application" clause. *Williams v. Taylor*, 529 U.S. 362, 404-5 (2000). A state court's decision would be considered "contrary to" established law if it is "diametrically different" from or "opposite in character or nature" to federal law as determined by the Supreme Court. *Id*. at 405. A "run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Id*. at 406.

However, such a "run-of-the-mill" decision could warrant habeas relief if it involved an "unreasonable application" of clearly established federal law as determined by the Supreme Court. If a state court decision correctly identifies the governing federal law but applies that law to the facts before it in an "objectively unreasonable" way, habeas relief would be appropriate. "Unreasonable" does not mean "incorrect;" "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

The state court decision must also be contrary to or an unreasonable application of clearly established Federal law, "as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). The *Williams* Court clarified that "[this] statutory phrase refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. The Supreme Court need not have specifically addressed a particular set of facts to have clearly established federal law, however, because "[t]he Court has made clear that its relevant precedents include not only bright-line rules but also the legal principles and standards flowing from precedent." *Gray v. Moore*, 520 F.3d 616, 621 (6th Cir. 2008); *see also Panetti v. Quarterman*, 551 U.S. 930 (2007).

## B.     First Ground for Relief

### 1.     Availability of Habeas Relief

The magistrate judge found that habeas relief was not available to Pudelski on his first ground for relief because he alleged error in the proceedings related to his motion for new trial, which the magistrate judge considered a post-conviction proceeding. This is a legal determination that is reviewed de novo. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999). Pudelski argues, and the State agrees, that the magistrate judge improperly found that the motion for new trial constituted a post-conviction proceeding. Appellant Br. p. 17-19; Appellee Br. p. 23-24. We agree with the parties

and have concluded that Pudelski's motion for new trial was not a post-conviction proceeding, and that his claim in this particular case is reviewable as a habeas claim.

The magistrate judge relied on *Kirby v. Dutton*, 794 F.2d 245 (6th Cir. 1986) for the proposition that habeas corpus relief is not available to challenge alleged errors in state post-conviction proceedings. Although *Kirby* is good law in the Sixth Circuit, in our opinion the magistrate judge misapplied *Kirby* to the facts of the present case. In *Kirby*, the petitioner filed a state post-conviction proceeding attempting to overturn his conviction of two counts of assault with intent to commit murder, and pursuant to Tennessee law the state court appointed counsel to represent the petitioner in the post-conviction proceedings. The petitioner's post-conviction action was dismissed, and on appeal of that decision the petitioner alleged that his appointed counsel had rendered ineffective assistance in the post-conviction proceeding. The Tennessee appellate courts rejected the petitioner's appeals, and he then filed a petition for a writ of habeas corpus in federal court in the Middle District of Tennessee claiming ineffective assistance of counsel in violation of the Sixth Amendment. The district court denied the petition on the ground that the Sixth Amendment applied only to criminal proceedings, not post-conviction proceedings that were civil in nature, and the petitioner appealed to this court. *Id*. at 245.

On appeal, a panel of this court found that it was unnecessary to review the correctness of the district court's determination and instead held that the petitioner's claims could not be brought in a federal habeas corpus petition. *Id*. at 246. After noting that "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody," *id*. (*quoting Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)), the court reasoned that allegations of constitutional violations in post-conviction proceedings did "not in any way [relate] to [the petitioner's] confinement," *id*. at 248, and did not come within the traditional scope of habeas corpus. The court "decline[d] to allow the scope of the writ to reach this second tier of complaints about deficiencies in state post-conviction proceedings," and affirmed the district court's denial of the petition. *Id*.

*Kirby* is inapplicable to this case. Pudelski filed his motion for a new trial based on newly discovered evidence, pursuant to Ohio Criminal Rule 33, on October 1, 1999, two weeks after he was sentenced and before he commenced his direct appeal. JA 113. After he filed his direct appeal on October 28, 1999 he asked the Eighth District Court of Appeals to stay the appeal pending the resolution of his motion for new trial in the trial court, which the court of appeals granted. Once the trial court denied the motion for new trial, the court of appeals considered the denial of that motion along with and at the same time as Pudelski's direct appeal of his conviction. *See State v. Pudelski*, 2001 WL 259215.

Pudelski's pre-appeal motion for new trial was part of the original proceedings and was not collateral to his conviction or a post-conviction proceeding. A conviction is not final until all appeals are exhausted, and in this case Pudelski moved for a new trial before his direct appeal was even taken. The court of appeals, moreover, considered the trial court's denial of Pudelski's motion for new trial as part of his direct appeal of his conviction, which shows that Pudelski's motion for new trial was not a collateral attack on his conviction or a post-conviction proceeding.

Persuasive authority from other circuit courts considering motions for new trial filed under Federal Rule of Criminal Procedure 33, which is similar to Ohio Criminal Rule 33, supports this conclusion. The petitioner in *Kitchen v. United States*, 227 F.3d 1014 (7th Cir. 2000), had been convicted of cocaine and firearms charges in federal court, and he appealed his conviction to the Seventh Circuit Court of Appeals. While the direct appeal was pending, he filed a Rule 33 motion for new trial based on newly discovered evidence, and the Seventh Circuit stayed the appeal pending the resolution of the motion for new trial. *Id*. at 1016-17. The district court denied the motion, and the petitioner desired to appeal that decision to the court of appeals. His attorney, however, inadvertently failed to file a notice of appeal, and the Seventh Circuit proceeded to consider the petitioner's direct appeal without considering the denial of the motion for new trial. The court of appeals affirmed the petitioner's conviction, and he then filed a § 2255 petition for a writ of habeas corpus, alleging ineffective assistance of counsel in

violation of the Sixth Amendment for the failure to file the notice of appeal denying the Rule 33 motion.  The district court denied the petition.  *Id*. at 1017.  The petitioner then appealed that decision to the Seventh Circuit.

The Seventh Circuit began by asking whether the petitioner had a right to the assistance of counsel during the Rule 33 motion for a new trial proceedings.  Criminal defendants have a Sixth Amendment right to counsel from the time when proceedings have been initiated against them until the termination of the direct appeal, *id*. at 1018, and so the question of whether the petitioner had a right to the assistance of counsel depended on whether the Rule 33 motion for new trial was part of the initial proceeding or was a collateral proceeding.  The court of appeals noted that the timing of the Rule 33 motion was "an important factor" in the decision, *id*., and after noting that the petitioner filed his Rule 33 motion for new trial "well before the decision of his direct appeal," *id*., held that

> it is wide of the mark to label a pre-appeal motion for a new trial as a "collateral attack."  We have noted the converse proposition that "[w]hen made following the outcome of a direct appeal, a Rule 33 motion plainly is 'collateral' in the usual sense of that term."  Here, however, [the petitioner's] direct appeal had not yet been decided, so his motion for a new trial clearly did not follow the outcome of his direct appeal.  Instead we can say that his motion for a new trial was in aid of the appeal of the conviction and sentence.  The conclusion that [the petitioner's] motion for a new trial was not a collateral attack is further supported by the procedural consideration that, had [the petitioner's] counsel filed a notice of appeal from the denial of the motion, the Rule 33 appeal could have been consolidated with [the petitioner's] direct appeal.  It would make no sense to label a pre-direct appeal Rule 33 motion as a "collateral attack" on the conviction, when the appeal from such a proceeding could be consolidated with the direct appeal of the conviction.  A properly denominated collateral attack on a defendant's conviction . . . could never be consolidated with the direct appeal, and is not even part of the criminal proceeding itself.  Therefore, because [the petitioner's] motion for a new trial was decided before our decision in his direct appeal, it may not be deemed a "collateral attack" on his conviction[.]

*Id*. at 1019 (internal citations omitted).  After finding the petitioner's counsel's performance deficient, the court of appeals affirmed the denial of the petition because the petitioner had not established prejudice.  *See also United States v. Berger*, 375 F.3d

1223, 1226 (11th Cir. 2004) (*citing Kitchen* for the proposition that "[a] post-conviction, *pre*-appeal Rule 33 motion is considered part of a defendant's direct appeal" (emphasis in original)).

The facts surrounding Pudelski's motion for new trial are even more squarely in favor of finding that his motion for new trial is not a collateral proceeding than the facts in *Kitchen*. Unlike the petitioner in *Kitchen*, Pudelski filed his motion for new trial before even filing his direct appeal. Furthermore, unlike the petitioner in *Kitchen*, Pudelski did actually appeal the denial of his motion for new trial to the Eighth District Court of Appeals, which then did actually consolidate and consider that issue along with the rest of Pudelski's direct appeal. Pudelski's motion for new trial was not a collateral attack on his conviction: it was instead a part of the direct appeal of his conviction.

We hold that when a state defendant files a motion for new trial before filing a direct appeal, and when the denial of that motion is then consolidated with and reviewed during the direct appeal, the motion for new trial is part of the original criminal proceedings and is not a collateral proceeding. In such a situation the rule in *Kirby* is inapplicable. Because Pudelski filed his motion for new trial before he filed his direct appeal and the denial of that motion was reviewed during the direct appeal, the magistrate judge and district court erred in finding that the denial of his motion for new trial constituted a collateral proceeding. Habeas relief is available on Pudelski's first ground for relief.

### 2.     Merits

On the merits of that ground for relief, however, habeas relief is not warranted. Pudelski's first ground for relief argues that the trial court abused its discretion and misapplied Ohio law when denying his motion for new trial based on newly discovered evidence, and that this ruling and the Eighth District Court of Appeals' affirmance denied him due process of law. Pudelski does not cite to or identify any federal law that these rulings are contrary to or an unreasonable application of, and even though he invokes the concept of federal due process, his claim is clearly premised on issues of state law. State law issues are not subject to habeas review, *see Estelle v. McGuire*, 502

U.S. 62, 67-68 (1991), and this Court can review the denial of Pudelski's motion for new trial only for constitutional error. To establish a constitutional due process claim, Pudelski must demonstrate that the trial court's denial of his motion for new trial was "so egregious" that it violated his right to a fundamentally fair trial. *See Fleming v. Metrish*, 556 F.3d 520, 535 (6th Cir. 2009); *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir. 2004).

The trial court's and court of appeals' rulings were not so egregious, because even if the new photograph of Pudelski's daughter had been presented at trial, reasonable jurors could still have found him guilty. At trial, the State's theory of the case was that the child died from a cerebral edema, or a swelling of the brain, as a result of a blunt impact that also caused a linear skull fracture on the back right side of the child's head. The assistant coroner who performed the autopsy and the coroner both testified that the skull fracture was a new injury, less than 24 hours old, based on their observations that there was fresh blood underneath the scalp, that there were no signs of healing at the site of the injury, that there was no scar tissue present, and that the edges of the fracture were sharp as opposed to dull, which are all consistent with a new as opposed to an old injury. Based on the fact that the child did not have any head injuries when her mother went to bed, and on the fact that Pudelski fed the child at midnight, the State argued that Pudelski was responsible for causing the skull fracture and subsequent brain swelling.

Testimony from other witnesses, such as the medical personnel who delivered the child, had established the presence of a caput, or bruise, on the back right side of the child's head after birth, but the coroner and assistant coroner concluded that this bruise was a separate injury from the skull fracture. They reached this conclusion because, during the autopsy, the assistant coroner discovered the presence of macrophages, white blood cells that clean up cellular debris (including blood from a bruise), at the caput's location. Macrophages do not appear immediately and would not be present at the site of a new injury: in this case, no macrophages were present at the site of the skull fracture, indicating that it was a new injury separate from the bruise present at birth.

Pudelski's theory of defense was that the infant had suffered a head injury during birth that caused the skull fracture found by the assistant coroner during the autopsy. Pudelski argued that this fracture had nothing to do with the infant's death, which Pudelski attributed to sudden infant death syndrome. To support this theory, Pudelski presented expert testimony from Drs. Robert Kiwi, Jan Leestma, and Michael Baden. These doctors all testified that, in their opinion, the skull fracture occurred during the child's birth, and that the skull fracture had no relationship to the child's eventual death, the cause of which they considered undetermined. *See, e.g.*, JA 1286. None of the doctors was able to cite to any definitive evidence that the child suffered an injury during birth; rather, they based their opinions on their review of the birth records and the autopsy report. The State focused on this lack of direct proof in its closing argument, and argued that no skull fracture was present at the time of the child's birth.

Pudelski now presents new evidence in the form of a photograph, taken a day after the infant's birth, showing a large bruise on the back right portion of the child's head. Pudelski argues that this photograph "conclusively proves" that his daughter was born "with a substantial head/skull injury in the exact location" of the skull fracture and blunt force injury that killed his daughter. According to Pudelski, "[t]he support the new photograph would add to [his] experts' testimony [who theorized but could not prove the existence of such an injury] discloses a strong probability that it would change the result if a new trial is granted." Appellant Br. p. 20, 24. We do not agree.

First, this photograph is not conclusive evidence that the child had a skull fracture at the time of her birth. Testimony at trial from one of Pudelski's own experts, Dr. Richard Kiwi, established that an x-ray is necessary to establish the presence of a linear skull fracture. JA 1277. This photograph is not an x-ray, and the mere depiction of a red bruise on the child's head does not establish that a skull fracture existed underneath the bruise. Given the fact that the bruise overlays the area in which the fracture was eventually found, the photograph may make it slightly more probable that a fracture existed at the time of birth. However, it does not conclusively establish that fact, as Pudelski argues, especially in light of the strong evidence that the State presented

at trial, such as the lack of signs of healing and the sharp edges of the fracture, indicating that the fracture was a new injury that had occurred within 24 hours of the child's death.

Second, this photograph is entirely cumulative. Pudelski's experts all opined at trial that the skull fracture existed at birth and did not contribute to the child's death, and the jury heard and rejected this theory. The photograph does not add anything of significance to the evidence and theories presented at trial. Moreover, testimony at trial had already established that the child had a large red bruise on the back right side of her head at birth, *i.e.* the caput testified to by the medical personnel who delivered the child. The jury thus already knew that such a bruise existed on the child's head at birth and could have considered the argument that the bruise indicated the existence of a skull fracture at birth, as Pudelski's experts opined. The jury was not convinced, however, and found that the skull fracture and resulting cerebral edema were new injuries. A photograph of the bruise, when direct testimony had already established its existence, adds nothing of significance to the evidence presented at trial and would not compel a juror to credit Pudelski's expert witness testimony and discredit the State's evidence.

Even if the jury had been presented with the photograph, Pudelski has not shown that the result of the trial would have been different. The trial court did not abuse its discretion or misapply Ohio law when denying Pudelski's motion for new trial, and the denial of the motion did not infringe on Pudelski's due process rights or his right to a fundamentally fair trial. The court of appeals' affirmance of the trial court's decision was reasonable and likewise did not deny Pudelski a fundamentally fair trial or violate his right to due process of law. Pudelski is not entitled to habeas relief on his first ground for relief.

## C.     Second Ground for Relief

Habeas relief is also not warranted on the merits of Pudelski's second ground for relief. Pudelski makes two arguments. First, he argues that the trial court violated Ohio Rule of Evidence 703 in admitting the coroner's expert testimony when the police report supporting that testimony was not in evidence. Second, he argues that his lack of access

to the police report denied him due process and violated *Brady v. Maryland* because the police report was favorable to the defense.

As for Pudelski's first argument, this again is an issue of state law that is not subject to habeas review. Only if Pudelski can show that this evidentiary ruling was so prejudicial that it violated his right to a fundamentally fair trial can he prevail. *See Fleming*, 556 F.3d at 535. A review of the record, however, reveals that the trial court's ruling did not prejudice Pudelski. When forming her expert opinion as to the cause of the infant's death, the coroner testified that she relied on the police report only to eliminate accident as the cause of death. The fact that the police report eliminated accident as the cause of death, however, had already been revealed at trial. The detective who investigated the infant's death testified that the investigation revealed no accident that could have caused the infant's death, and that this information was in the police report. The sources that the police investigation relied on to arrive at this conclusion included interviews of Pudelski and Pudelski's wife, information from the deputy coroner, and information from the paramedics who arrived at Pudelski's home in response to the Pudelskis' emergency call. These individuals all testified at trial. Thus, given that the detective testified as to the contents of the police report and that the sources of information that supported the police report were all available for examination at trial, even if the trial court violated Ohio Rule of Evidence 703 (an issue as to which we express no opinion), we cannot conclude that the trial court's decision to deny Pudelski access to the police report itself prejudiced him in any way, much less was so prejudicial that it denied Pudelski a fundamentally fair trial.

Pudelski's second argument is that the trial court's ruling denying him access to the police report violated *Brady v. Maryland*. *Brady* stands for the proposition that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). A *Brady* claim has three elements: "The evidence at issue must be favorable to the accused either because it is exculpatory, or because it is impeaching; that evidence must

have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004).

Pudelski's argument, however, is without merit. First, according to the testimony of the witnesses at the trial, the police report was not favorable to Pudelski, because it eliminated an innocent explanation for the infant's death by finding that her death was not caused by an accident. This evidence helped to incriminate, not exculpate, Pudelski, as he was the last person to interact with the child before her death. The report also stated that Pudelski physically assaulted the infant, which again is not exculpatory. J.A. 1206-7. There is no indication that the police report itself contained any exculpatory information (and the dissent admits as much, *see* dissenting op. at 6).

Pudelski argues that having access to the police report would have allowed him to impeach the coroner at trial, and the Supreme Court has indeed recognized that impeachment evidence can fall within *Brady*'s rule. *See United States v. Bagley*, 473 U.S. 667, 676 (1985). Even if it is assumed that the police report contained potential impeachment evidence satisfying the first element of a *Brady* claim, however, Pudelski cannot establish that the suppression of that evidence resulted in prejudice. Prejudice to the petitioner, the third element of a *Brady* claim, is established only if the suppressed evidence is material; evidence is material under *Brady* only if it presents a "reasonable probability" that the outcome of the trial would have been different if the evidence had been disclosed. *Id*. at 682. Viewing the evidence presented at the trial in its entirety, there is no reasonable probability that the outcome of the trial would have been different if the actual police report itself had been presented and used for impeachment purposes.

During oral argument much was made of the fact that the police report is not in the record, and that neither party has actually reviewed the police report's contents. Pudelski argues that the court below could not have held that the police report did not contain exculpatory evidence without knowing what was actually in the police report. Pudelski, however, bore the burden of establishing his *Brady* claim, including the burden of establishing that the police report contained material evidence. *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). Pudelski has not presented any evidence tending to

show that the police report contained material evidence; rather, all of the evidence in the record tends to show that multiple witnesses testified as to the contents of the police report, and that the police report simply eliminated accident as the cause of the infant's death. If Pudelski's attorney was denied an opportunity to view the police report, a denial he now claims was error, he should have had the police report made part of the record at trial so that its contents would be available to any reviewing court. Pudelski's attorney, however, did not do this, and we cannot change or remake the record that is presented to us on appeal.[3]

The dissent admits that the police report was "likely not *exculpatory*" but argues that "its impeachment value alone could render it material." Dissenting op. at 30 (emphasis in original). It is undisputed, however, that neither the prosecuting attorney nor the defense attorney knows what is in the police report; nor does the district judge, and nor do we appellate judges. According to the oral arguments in this court, it is not even known whether the report exists any longer, or, if it does, who has possession of it. While the dissent indulges in speculation as to how the report might possibly have been favorable to the defense in the cross-examination of the county coroner, it is certainly more probable that the content of the report supports the coroner's testimony and was favorable to the prosecution. In fact, the dissent acknowledges that "Balraj's own statements make clear that the contested report implicated Pudelski as the perpetrator of a physical assault." Dissenting op. at 30.

As the dissent concedes, "[t]he most difficult question underlying Pudelski's *Brady* claim is whether the report was material," *i.e.* whether there is a "reasonable probability" that the result of the trial would have been different if the report itself had been physically produced, *United States v. Bagley*, 473 U.S. 667, 682 (1985), or that the

---

[3] The dissenting opinion states that it is untenable for the majority to "fault Pudelski for failing to produce a report that he himself requested but was denied." Dissenting op. at 32. This is a misreading of the majority opinion. We do *not* state that Pudelski himself had the burden of producing the report; rather, we state that Pudelski's attorney had the duty on behalf of his clinet to be sure that the disputed police report was made a part of the record of the trial. Normally, when a disputed item of evidence is excluded by the trial judge, a proffer is made regarding the excluded testimony or, in the case of a excluded document, the document itself is directed to be made a part of the record in order that a reviewing court can properly determine whether the trial court's ruling was correct.

defendant was denied a fair trial, *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Dissenting op. at 29. The dissent suggests various possibilities as to how the defense attorney - who cross-examined Balraj twice concerning the report - possibly could have used the physical report for additional impeachment of Dr. Balraj's testimony.[4] It is simply not reasonable to conclude that these hypothetical uses of the report, based on absolute speculation as to the contents of a report we have not seen, could even come close to meeting the burden that the law places on the petitioner to show that the police report contained material evidence.

Finally, the dissent refers to an alleged practice of this court to "routinely" remand "when it determines that consideration of additional evidence would help it render a proper decision." Dissenting op. at 32. It is hardly a "routine" practice, however, for an appellate court to remand a case in order to require that a search be made for a missing report, which was ordered excluded by the trial judge and not made a part of the record, for the purpose of finding the report and then including it in a reopened record and directing the district judge, after briefing and argument from the parties, to determine whether the state trial judge, following an extensive voir dire hearing, made a mistake in excluding the report.

Pudelski's second ground for relief does not merit habeas relief.

## IV.

For the above reasons, the district court's dismissal of Pudelski's habeas petition is AFFIRMED.

---

[4]Nearly fourty pages of the trial transcript deal with Pudelski's attorney's cross-examination of Dr. Balraj about the role the police report played in her investigation, what information was contained in the police report, and the extent to which her ultimate conclusion was based on information in the report.

———————————

**DISSENT**

———————————

CLAY, Circuit Judge, dissenting.  I agree that the state court's denial of Pudelski's motion for a new trial based on newly discovered evidence did not violate Pudelski's due process rights, and I therefore join the majority's decision to affirm the district court's denial of habeas relief as to that claim.  However, I disagree with the majority's analysis of Pudelski's claim that the prosecution violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose a police report that was provided to the state's expert witness.  Taking into consideration the facts presented in this case, there is a reasonable likelihood that the report at issue could have been used to impeach a critical state witness who testified unequivocally as to the cause of the victim's death.  However, because the contested report was never provided to Pudelski and is not part of the record in this case, no court has had an opportunity to properly assess its impeachment value in order to determine whether the prosecution withheld favorable and material evidence in violation of *Brady*.  In light of these concerns, I decline to join the majority's decision to deny habeas relief as to that claim.  Instead, I would remand with instructions that the state be required to produce the report so that the district court can evaluate whether non-disclosure of the report violated clearly established federal law under *Brady*, 373 U.S. 83.[1]

I.

In *Brady*, the Supreme Court held that the prosecution has a duty to disclose evidence favorable to the defendant and material to his guilt and punishment, irrespective of the good faith or bad faith of the prosecution.  *Id.* at 87.  The Supreme Court has since held that the duty to disclose such evidence is applicable even if there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and

———————————

[1] As the majority notes, when Pudelski presented this claim to the state courts, he relied solely on Ohio law when arguing for relief.  I agree that his claim appears to be procedurally defaulted, but I also agree with the majority's decision to excuse the apparent default.  *See* slip op. at 11-12.

that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985). A *Brady* violation has three distinct components and Pudelski has the burden of showing (1) that the prosecution withheld evidence, (2) that the evidence was favorable to him, and (3) that the evidence was material. *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999); *Moore v. Illinois*, 408 U.S. 786, 794-795 (1972).[2]

## A.

In the instant case, it is undisputed that the prosecution failed to disclose a police report that was provided to the state's expert witness. At trial, Pudelski requested a copy of the police report that had been reviewed by Dr. Elizabeth Balraj, Cuyahoga County Coroner ("Balraj"). The court allowed defense counsel to conduct a voir dire regarding the police report outside of the jury's presence, and Balraj testified that she had used the report in her review of the case. When asked by the court if there was "anything specific in the police report that caused you to render you medical opinions[,]" Balraj answered in the negative. (Joint Appendix ("J.A.") at 1165.) The trial court then denied Pudelski's motion to instruct the prosecution to disclose the report. This sequence of events establishes that the report at issue existed and that it was not disclosed to the defense. It is therefore clear that, at a minimum, the prosecution failed to disclose the contested report. *See Strickler*, 527 U.S. at 282 ("Two of those components [of a *Brady* violation] are unquestionably established by the record in this case. . . . [W]ith respect to [the] documents, there is no dispute about the fact that they were known to the State but not disclosed to trial counsel.").

---

[2]The Supreme Court has explained that "[t]he term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence -- that is, to any suppression of so-called '*Brady* material' -- although, strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281.

B.

The salient questions then become whether the report contained evidence that was favorable to Pudelski and whether any such evidence was material. *See id.* As discussed above, the Supreme Court has made clear that "favorable" evidence encompasses impeachment evidence as well as exculpatory evidence. *Bagley*, 473 U.S. at 676 ("Impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule."). This is because impeachment evidence, "if disclosed and used effectively . . . may make the difference between conviction and acquittal." *Id.; see also Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.").

In the instant case, it appears that the police report requested by the defense had potential impeachment value. At trial, the defense presented its own medical experts who had reviewed the infant's medical records and who unequivocally concluded that a birth injury was the cause of death. Balraj, in contrast, provided expert testimony that the infant died "as a result of a blunt impact to head" and that "the manner of death [wa]s homicide." (J.A. at 1161-62.) Because the cause of death was a central and disputed issue in the case, Balraj's testimony was critical.

On cross-examination, Balraj stated that she reviewed police reports received by her office and that the police investigation was one of the facts she relied upon to reach a conclusion as to the matter of death. She acknowledged that her coroner's verdict contained several references to an alleged assault by the father, which included a statement that "[t]he death in this case was the end result of blunt impact to head sustained when allegedly assaulted by her father." (J.A. at 1209.)

Based on this testimony, Pudelski had a viable argument that the coroner's findings were influenced by the police report and that he could have used the report to impeach her impartiality and the basis for her conclusions. Consequently, this Court can fairly conclude the report was favorable. *See Harris v. Lafler*, 553 F.3d 1028, 1033 (6th

Cir. 2009) ("Because *Brady* applies not only to exculpatory evidence but also to impeachment evidence, . . . and because Harris could have used these statements to cast doubt on the credibility of Ward's testimony, *Brady* covers the statements.  Harris, then, satisfies the first two elements of a *Brady* claim[.]") (citation omitted).

## C.

The most difficult question underlying Pudelski's *Brady* claim is whether the report was material.  Favorable evidence is "material," and constitutional error results from its non-disclosure, if there is a "reasonable probability" that the result of the proceeding would have been different if the evidence had been disclosed to the defense. *Bagley*, 473 U.S. at 682.  "*Bagley*'s touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

If Balraj's testimony had played a limited role in the determination of guilt, there would be considerable doubt as to whether non-disclosure of the report, and the concomitant limitations on Pudelski's attempts to impeach Balraj, were significant enough to "undermine confidence in the trial" as required in *Kyles*. *See id.*  However, the circumstantial nature of the case against Pudelski and the centrality of Balraj's testimony both weigh in favor of a finding that any potential impeachment evidence would have been material. *See Agurs*, 427 U.S. at 112-113 ("The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. . . . [T]he omission must be evaluated in the context of the entire record.")  Here, the state had no physical evidence linking Pudelski to the crime, and the jury obviously credited Balraj's expert testimony over the testimony of Pudelski's medical experts.  As the Supreme Court has noted, in a case like this, where "the verdict is already of questionable validity," evidence is more likely to be material because "additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.*

The prosecution and defense disagree as to how effective the police report would have been as an impeachment tool. The majority asserts that "all of the evidence in the record tends to show that multiple witnesses testified as to the contents of the police report, and that the police report simply eliminated accident as the cause of the infant's death." Slip op. at 24. However, Balraj's own statements make clear that the contested report implicated Pudelski as the perpetrator of a physical assault. Balraj acknowledged that her coroner's verdict contained several references to an alleged assault by the father and included a statement that "[t]he death in this case was the end result of blunt impact to head sustained when allegedly assaulted by her father." (J.A. at 1209.) The report therefore did more than "eliminate accident as a cause of death." To the contrary, it put before the coroner the police investigator's conclusion that the infant had been physically assaulted by her father. Even if the report was likely not *exculpatory*, its impeachment value alone could render it material. *See Bagley*, 473 U.S. at 684.

Pudelski's attorney could have used this report and Balraj's references to it in her coroner's verdict to suggest that Balraj conducted her investigation with a preconceived notion that a homicide had occurred. He also could have used the report to impeach Balraj as to the accuracy of her representation of the report. Without the police report, defense counsel had no way of challenging whether the report said more than or less than what Balraj said it did and the extent to which the report may have influenced her medical findings. As noted above, when asked about the report in voir dire, Balraj stated that she used the report only to eliminate accident as a cause of death. On cross-examination, however, she conceded that her coroner's verdict contained several references to an alleged assault by the father and concluded that "[t]he death in this case was the end result of blunt impact to head sustained when allegedly assaulted by her father." (J.A. at 1209.) This concession suggests that Balraj had understated the role that the report played in her verdict until she was confronted with contradictory evidence. It is likely that other discrepancies about Balraj's portrayal of and use of the report could be discovered only through access to the report itself. There is therefore no dispute as to the report's critical relationship to the issues presented by this case.

Although Pudelski has been denied an opportunity to review the report, the majority believes that Pudelski should be denied access to it unless he can specifically explain in advance why the report might have made a difference to his defense.  The unfairness of demanding that Pudelski address his arguments to the particulars of a report that he has not seen is evident.  As a result, Pudelski has been left in the untenable position of being a defendant who has made available to the prosecution at trial his experts, their reports, and the evidence they used to reach their conclusions, but has been denied the reciprocal right to have access to the police report utilized by the prosecution's expert with respect to the same issues.  Pudelski was therefore unable to fully and effectively challenge the extent to which the report may have influenced Balraj's conclusions and to have the jury determine whether her conclusions could be sustained to a reasonable degree of medical certainty.

D.

At oral argument, there was discussion as to whether Pudelski, the habeas petitioner, bore the burden of producing the report.  The majority concludes that he did.  In support of this conclusion, the majority asserts that "Pudelski has not presented any evidence tending to show that the police report contained material evidence" and that Pudelski "should have had the police report made part of the record at trial so that its contents would be available to any reviewing court."  Slip op. at 23-24.

I disagree with these assertions on two bases.  First, Pudelski in fact did present evidence tending to show that the report contained material evidence because, as discussed above, he presented evidence that Balraj considered the police report in reaching her conclusions and rendering a cause of death.  (*See* J.A. at 1209.)  Second, it is undisputed that Pudelski requested the report at trial and made significant efforts to alert the  court to the value of the report in his defense.  It is unclear how Pudelski could have "had the police report made part of the record at trial," *see* slip op. at 24, when he was denied a copy of the report even though he explicitly requested it at trial.  While it is true that Pudelski bears the burden of establishing that the report was material, *see Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998), this burden does not logically translate into

a conclusion that Pudelski also bears the burden of producing a report to which he was denied access. Just as the Supreme Court has stated that a rule that "'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process[,]" *Banks v. Dretke*, 540 U.S. 668, 696 (2004), it is equally untenable to fault Pudelski for failing to produce a report that he himself requested but was denied.

While it might have been preferable for Pudelski to have requested this report again in proceedings before the district court, his failure to do so does not preclude us from remanding for further fact finding. The critical point is that Pudelski requested that the report be provided to him at his state court trial; and Pudelski preserved the *Brady* issue with respect to having been denied the report in his arguments before the district court. The majority states that "we cannot change or remake the record that is presented to us on appeal[,]" slip op. at 24, but this Court has broad discretion to order a remand, can require further proceedings that it deems "just under the circumstances," 28 U.S.C. § 2106, and routinely does so when it determines that consideration of additional evidence would help it render a proper decision. Under the circumstances presented in this case, I conclude that a remand for additional fact finding is the just and proper course.

## II.

In light of the aforementioned concerns, I disagree with the majority's decision to deny habeas relief with respect to Pudelski's *Brady* claim. Instead, I would remand with instructions that the state be required to provide the contested report to the district court, and that the district court evaluate whether the failure to disclose the report violated clearly established federal law under *Brady*, 373 U.S. 83. I therefore respectfully dissent.